30(b)(6) Tahir Shareef                                                    May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 272
1 that is, you know, with me. So that could have
2 been from anywhere.
3    Q   I don't understand that answer. Did you
4 find this document on the street or did you find it
5 at the United Inn and Suites?
6    A   I don't know. It could have been in the
7 United Suites email.
8    Q   So it could have been a document that you
9 found on your business email account?
10    A   Yeah.
11    Q   It also could have been a hard copy
12 document?
13    A   I don't know. That's the reason I was
14 confused.
15    Q   Well, you agree with me that it looks
16 like it has been photocopied, you can see some
17 markings in the left-hand side and it is not lined
18 up properly on the page?
19    A   Right.
20    Q   Do you agree it looks like it was
21 photocopied?
22    A   I don't know.
23    Q   And there's no email that was produced in
24 this case that contains this document. Are you
25 aware of that?

Page 273
1    A   Yes.
2    Q   So you're saying you just don't know if
3 this was in a hard copy file at your business or
4 not?
5    A   That's correct.
6    Q   I wanted to ask you about -- well, let me
7 back up a second. You're not disputing that you
8 had this document in your possession though; is
9 that correct?
10    A   It could have been in an email.
11    Q   There's a list here of crimes that were
12 reported at the United Suites in Plaintiff's
13 Exhibit 2 for the period January 2017 to March 31,
14 2017. One of the crimes listed it says runaway
15 juvenile. Is that familiar to you?
16    A   No.
17    Q   Do you know what crime that is referring
18 to?
19    A   No.
20    Q   When you received this notice, did you
21 call the DeKalb County Police Department to
22 inquire?
23    A   No.
24    Q   Did you have any concerns about there
25 being a reported crime involving a runaway juvenile

Page 274
1 at your property?
2    A   I don't know, you know, if I called them,
3 you know, the DeKalb County for any of these
4 crimes, these incident or not. But I don't know.
5    Q   You don't remember calling them?
6    A   No.
7    Q   Is it possible you did not call them?
8    A   I don't know.
9    Q   The next paragraph says: Please take
10 appropriate security measures to ensure the safety
11 of your patrons. Potential safety measures to
12 implement include, but are not limited to,
13 sufficient lighting, open paren, parking lots,
14 perimeter entrances, stairwells, close paren;
15 property landscaping, open paren, trimming of trees
16 slash bushes around the windows, stairways, walk
17 paths and common areas, close paren; adequate
18 security, open paren, private security, off duty
19 police, rotating days when security present, close
20 paren; proper signage slash surveillance video,
21 open paren, no loitering, unlawful activities not
22 permitted, signage about video surveillance, close
23 paren.
24       Do you see that?
25    A   Yes.

Page 275
1    Q   Do you remember reading this letter when
2 you received it, Mr. Shareef?
3    A   I don't know. It is so long ago, so I
4 don't know.
5    Q   Well, what would be your practice in 2017
6 if you received a letter from the DeKalb County
7 Police Department, would it be important to you?
8    A   Yes, it is important. I read them and I
9 see if there is some overgrown bushes or some
10 lighting problem at the parking lot. I always have
11 the signs there no loitering, unlawful activities.
12 I always have those signs. So if somebody knock
13 down the sign, we put it back.
14    Q   We discussed in your February deposition
15 that for the years 2017 to 2019, the United Inn had
16 security at the property from the hours of
17 10:00 p.m. to 2:00 a.m.
18    A   Yes.
19    Q   But not for the other hours --
20    A   Right.
21    Q   -- is that correct?
22    A   Right.
23    Q   In other words, the United Inn for the
24 years in question had security for four hours a day
25 but not for 20 hours a day?

6 (Pages 272 - 275)

Page 276

1    A    Right.
2    Q    And you told me in February that the
3  DeKalb County Police Department recommended to you
4  and your hotel that you have more security; is that
5  correct?
6    A    I mean they always come in and recommend
7  things.  But I don't know if they specifically -- I
8  mean they if they do see some sign knocked down or
9  something, they may have, you know, tell me these
10  things.
11    Q    Well, that's not what I'm talking about.
12  I'm not asking you about signs.  Last time in
13  February when we talked, you said that the police
14  came about two to three times a week for the years
15  2017 to 2019.
16    A    Uh-huh (affirmative).
17    Q    Do you recall that?
18    A    Yes.
19    Q    And I asked you, I said Mr. Shareef, you
20  know, at some point in time as the owner and
21  general manager of the hotel, did you ever go to
22  the police and say what can I do to try to prevent
23  crime?
24    A    Uh-huh (affirmative).
25    Q    Seems like two to three visits a week

Page 277

1  from the police is a high volume of visits.  And
2  you said that one of the things that they
3  recommended was hiring more security.  Do you
4  remember that?
5        MS. RICHENS:  Objection to the form of
6  the question.
7    A    I don't know.
8  BY MR. BOUCHARD:
9    Q    But you would agree with me that from
10  2017 to 2019, you never had security at the
11  property outside of 10:00 p.m. to 2:00 a.m.?
12    A    I don't.
13    Q    You do not agree or you do agree?
14    A    I agree that I have security only on
15  those times.
16    Q    The last paragraph for Plaintiff's
17  Exhibit 2 says, quote, the DeKalb County Police
18  Department is able and willing to work with you on
19  efforts to implement prevention measures at your
20  hotel and answer any questions.
21        Do you see what I just read?
22    A    Yes.
23    Q    What do you understand the word
24  prevention to mean?
25    A    Prevent the crime.

Page 278

1    Q    What does that mean?
2    A    That mean prevent the crimes.
3    Q    To take action to stop crime from
4  happening in the future?
5    A    Uh-huh (affirmative).
6        MR. UNDERRINER:  Object to the form.
7  BY MR. BOUCHARD:
8    Q    Well, if you don't understand -- I mean
9  is what I just said your understanding of
10  prevention or do you have a different
11  understanding?
12    A    No, I have the understanding of
13  prevention.
14    Q    To try to avoid crime from happening in
15  the future?
16    A    Yes.
17    Q    What do you understand this sentence to
18  mean that I just read, the DeKalb County Police
19  Department is able and willing to work with you on
20  efforts to implement prevention measures at your
21  hotel and answer any questions?
22    A    Yeah, if I have any question and they
23  give me this phone number, I could call them.
24    Q    What about able and willing to work with
25  you on efforts to implement prevention measures?

Page 279

1    A    Meaning that, you know, if they need to,
2  you know, talk to me and maybe suggest something.
3    Q    Did you ever ask them to work with you on
4  efforts to implement prevention measures?
5    A    No.  I have these officer, they are from
6  the same department.  I talk with them all the
7  time.  They work for me.  They come every night.
8  So those are the, you know, question I tell them,
9  you know, that we need to -- what we can do.  And
10  they always, you know, suggested that, you know, we
11  have a problem, call 911, call the cops.
12    Q    Other than Weber and McClelland who I
13  believe you're referring to right now.
14    A    Yes.
15    Q    Did you ever ask the DeKalb County Police
16  Department to work with you on efforts to implement
17  prevention measures at the hotel?
18    A    I don't know.
19    Q    Well, you understand that you're the
20  30(b)(6) representative for Northbrook Industries,
21  Inc. on the topic of, among others, security at the
22  property.  This is my only opportunity before
23  trial, Mr. Shareef, to understand what security
24  measures for example the hotel had in effect during
25  the relevant period.  Do you understand that?

7 (Pages 276 - 279)

30(b)(6) Tahir Shareef                                                    May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 280

1   A   Yes.
2   Q   Are you prepared to testify today?
3   A   I am.
4   Q   Did the hotel or did not the hotel take
5   on the DeKalb County Police Department's request
6   and offer -- let me strike that and ask it again.
7       At any point in time did the United Inn
8   and Suites ask the DeKalb County Police Department
9   to work with it on efforts to implement prevention
10  measures at the hotel?
11  A   Like I said, I talked to the Sergeant
12  Weber and Sergeant McClelland, so they are the
13  representative, you know, from the Police
14  Department, same department which you asked me, you
15  know, what I have done.  So this is my main source,
16  so I always seek help from them.
17  Q   Other than them, the answer is no?
18  A   That's right.
19  Q   And they were working in an off-duty
20  capacity from 10:00 p.m. to 2:00 a.m.?
21  A   Yes.
22  Q   The rest of the day they were not working
23  at the property, they were working for the DeKalb
24  County Police Department or they were at home or
25  doing something else, right?

Page 281

1       MR. UNDERRINER:  Object to form.
2   A   Maybe.
3   BY MR. BOUCHARD:
4   Q   I mean did they work at your hotel the
5   other 20 hours per day?
6   A   No.
7   Q   And have you produced all the text
8   messages in this case that you have from the years
9   2017 to '19 with Weber and/or McClelland?
10  A   I guess so.
11  Q   So when you say you were communicating
12  with them all the time, that would be reflected in
13  the text messages you produced?
14  A   Yes.
15  Q   Did you ever ask the DeKalb County Police
16  Department to help train your staff on sex
17  trafficking?
18  A   Did I ever ask.  No.
19  Q   Or on commercial sex activity?
20  A   No.
21  Q   Did you ever ask the DeKalb County Police
22  Department to train your staff on indicators of
23  crime?
24  A   Did I ask them.  No.
25  Q   Did you ever ask the DeKalb County Police

Page 282

1   Department to do a security assessment of your
2   property?
3   A   No.
4   Q   Did you ever ask the DeKalb County Police
5   Department to do an assessment of measures you
6   could put in effect to reduce crime on the
7   property?
8   A   Again, my source is those police officer.
9   They are there and I meet them almost nightly
10  basis.  So I ask them, you know, if there's
11  anything -- if there's any question, so I might
12  have asked them.  I don't know.  This is 2017.
13  Q   This letter didn't come from Weber or
14  McClelland, correct?
15  A   Uh-huh (affirmative).
16  Q   Is that right?
17  A   Yes.
18  Q   It came from a Major Padrick, right?
19  A   Okay.  Yes.
20  Q   And McClelland and Weber were working at
21  the United Inn in an off-duty capacity four hours
22  per day prior to this letter being sent to you,
23  right?
24  A   Yes.
25  Q   Did the United Inn take any action based

Page 283

1   on this letter, Plaintiff's Exhibit 2?
2   A   We might have.  Like I told you, whatever
3   we think is appropriate to help, we do it.
4   Q   What I'm asking is in response to your
5   receiving Plaintiff's Exhibit 2, did the hotel
6   implement some new security measure?
7   A   Some new security measure.  I don't know.
8   I think that's -- I don't know but we might have.
9   I don't know.
10  Q   Did the hotel continue doing what it had
11  always done as it relates to security after it
12  received Plaintiff's Exhibit 2?
13      MR. UNDERRINER:  Object to the form.
14  A   Can you repeat the question.
15  BY MR. BOUCHARD:
16  Q   Yeah.  You told me that Weber and
17  McClelland were working four hours per day --
18  A   Uh-huh (affirmative).
19  Q   -- prior to receipt of this letter in
20  2017, right?
21  A   Yes.
22  Q   After you received this letter, that is
23  Plaintiff's Exhibit 2, did you ask Weber or
24  McClelland to start working more hours per day?
25  A   No.

8 (Pages 280 - 283)

Case 1:20-cv-05232-JPB   Document 127-4   Filed 01/18/24   Page 4 of 12
30(b)(6) Tahir Shareef                                          May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 284
1  Q   Did you ask other security to come in and
2 start working other hours during the day?
3  A   No.
4  Q   Did you implement any other new security
5 measures after receiving Plaintiff's Exhibit 2
6 based on Plaintiff's Exhibit 2?
7  A   No.
8  Q   So as the owner of the hotel, it is not
9 like you got Plaintiff's Exhibit 2 and you said
10 wow, I am going to implement some new security
11 measures based on what I am reading here?
12     MR. UNDERRINER:  Object to the form.
13 BY MR. BOUCHARD:
14  Q   I didn't hear your answer, sir.
15  A   I don't know how to answer it.  But
16 again, you know, I pass whatever information to my
17 officers, and that's my best source because they
18 working on the same department and they are very,
19 you know, qualified people.
20     (Plaintiff's Exhibit 3 marked)
21 BY MR. BOUCHARD:
22  Q   I'm showing the witness Plaintiff's
23 Exhibit 3 which is Bates stamped NBI 03765 and
24 NBI 03766 through NBI 03774.
25     Mr. Shareef, I have handed you what's

Page 285
1 been marked as Plaintiff's Exhibit 3 which is an
2 email and the attachment to the email.  Do you see
3 that?
4  A   Yes.
5  Q   And it is an email from Chief Sumlin to
6 the hotel's email account at Gmail.  Do you see
7 that?
8  A   Yes.
9  Q   Dated November 14th, 2017; is that right?
10  A   Yes.
11  Q   And this is about seven months after the
12 date on Plaintiff's Exhibit 2, that letter we were
13 just looking at from the DeKalb County Police
14 Department; is that right?
15  A   Yes.
16  Q   Are you familiar with this email and the
17 Proposal for Security Services attached to it?
18  A   Yes, I have seen it.
19  Q   You're familiar with it?
20  A   I may have seen this one that time.  I
21 may have talked to him.  I don't know.
22  Q   Did you review any documents to prepare
23 for your deposition today?
24  A   No, I did not.
25  Q   Have you reviewed the documents that you

Page 286
1 produced in this case?
2  A   The documents, you got it from your --
3 from my United Inn email.  You know, that's a long
4 time ago.  I did not, you know, read, you know,
5 lately what is there.
6  Q   No.  I'm talking about documents that
7 were produced for the first time last week.  Have
8 you read these documents, Mr. Shareef?
9  A   From the emails?  What is the question?
10 Which documents you are -- I don't know.
11  Q   The whole reason that we're here today is
12 because there were documents produced after you
13 were deposed in February.
14  A   Okay.
15  Q   Do you understand that?
16  A   Yes.
17  Q   In fact, those documents were produced
18 last week.  Do you understand that?
19  A   Via email.  Via ...
20  Q   The documents were provided from your
21 lawyer to me last week.  Do you understand that?
22  A   Yes.
23  Q   Have you reviewed those documents in
24 connection with getting ready for your deposition
25 today, Mr. Shareef?

Page 287
1  A   I have seen some.  But I don't know, what
2 is -- how many of them you get it via email?
3     THE WITNESS:  Is that that email we
4 talking about here?  Which document he's
5 concerning?
6     MS. RICHENS:  You received this by email.
7     THE WITNESS:  Email.  Yeah.
8     MS. RICHENS:  He's asking if you remember
9 receiving it?
10 BY MR. BOUCHARD:
11  Q   Well, actually that's not what I'm
12 asking.
13  A   Okay.
14  Q   I'm asking if you have reviewed the
15 documents that your lawyers produced to me last
16 week in this case?
17  A   No.
18  Q   You did not?
19  A   No.
20  Q   But you're prepared to give testimony
21 today on behalf of the corporation?
22  A   But I don't know that this the document,
23 you know, I'll see and I have to remember, you
24 know, what happened in 2017.
25  Q   Well, I'm not asking you to remember

9 (Pages 284 - 287)

30(b)(6) Tahir Shareef                                                    May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 292

1    A    Yes.
2    Q    Do you agree with me that it looks like,
3  according to Plaintiff's Exhibit 3, Brown
4  Protective Services would have been available 24
5  hours a day?
6    A    Yes.
7    Q    Did you receive proposals from any other
8  security service providers that would have provided
9  you with 24-hour security at the hotel?
10   A    I don't know.
11       MR. UNDERRINER:  Object to the form.
12 BY MR. BOUCHARD:
13   Q    You don't recall?
14   A    I don't know.
15   Q    Well, do you believe that you received
16 other proposals like this one around that time in
17 2017 when you were shopping?
18   A    I don't know.
19   Q    Well, you have testified earlier today
20 that in 2017 you reached out and requested
21 proposals either by email or phone from other
22 security providers, right?
23   A    Yes.
24   Q    Do you think Brown Protective Services
25 was the only service provider that you reached out

Page 293

1  to or do you think there were others?
2    A    Maybe.  I don't know.  Maybe there are
3  other.
4    Q    Do you think there were or do you not
5  think there were?
6    A    I don't know.
7    Q    But you're the only person who would know
8  that, right, Mr. Shareef?
9    A    Right.
10   Q    And your testimony is I just don't know?
11   A    I mean yeah, I don't know.  That's the
12 best I can remember.
13   Q    Where did you get the name Brown
14 Protective Services from?
15   A    Maybe he left a card there.  He left a
16 business card there.  I don't know how, you know, I
17 had contact with him.
18   Q    Why did you not hire them?
19   A    For maybe any reason.  I don't know.  I
20 don't even recall, you know, what the conversation
21 was with him.  But I don't have the answer.
22   Q    You received this proposal in
23 November 2017, but you decided not to hire Brown
24 Protective Services?
25   A    Yes.

Page 294

1    Q    And you do not recall why?
2    A    I don't know.
3    Q    And you didn't decide in November 2017 or
4  thereafter to hire any other private security
5  company to provide additional security at the
6  property; is that correct?
7    A    I may have.  I don't know.
8    Q    Well, I think the answer is no.  But let
9  me ask again.
10   A    Uh-huh (affirmative).
11   Q    Between 2017 and 2019, other than Weber
12 and McClelland, did you at any time have any other
13 private security at the hotel?
14   A    No.
15   Q    So you've never hired another private
16 security company?
17   A    No.
18   Q    Correct?
19   A    That's right.
20   Q    So we don't know if you got any other
21 proposals other than this proposal in Plaintiff's 3
22 from Brown Protective Services.  But regardless,
23 you didn't hire anybody else, right?
24   A    Right.
25   Q    And what I don't understand is why you

Page 295

1  didn't hire more security?
2    A    There could be their timing issue or my
3  timing issue or some other -- I don't know.
4       (Plaintiff's Exhibit 4 marked)
5  BY MR. BOUCHARD:
6    Q    Mr. Shareef, I'm handing you what's been
7  marked as Plaintiff's Exhibit 4.  And Plaintiff's
8  Exhibit 4 is Bates stamped NBI 2566 to 67.
9  Mr. Shareef, page 1 of Plaintiff's Exhibit 4 is a
10 Business Record Certification in the United States
11 District Court for the Northern District of Georgia
12 and the second page of Plaintiff's Exhibit 4 is a
13 Waiver of Appearance and Document Receipt.  Do you
14 see that?
15   A    Yes.
16   Q    The second page of Plaintiff's Exhibit 4
17 is captioned Northern District of Georgia, In Re:
18 Grand Jury Proceedings, the second page.  Do you
19 see that at the top of the document?
20   A    Yes.
21   Q    Did United Inn and Suites receive a
22 federal grand jury subpoena in 2017?
23   A    Are you talking about this one?
24   Q    I'm asking did United Inn and Suites
25 receive a federal grand jury subpoena in 2017?

11 (Pages 292 - 295)

Case 1:20-cv-05232-JPB    Document 127-4    Filed 01/18/24    Page 6 of 12
30(b)(6) Tahir Shareef                                    May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 312

1    A    Underage person.
2        (Plaintiff's Exhibit 8 marked)
3  BY MR. BOUCHARD:
4    Q    I'm showing you what's been marked as
5  Plaintiff's Exhibit 8. This is another email from
6  Investigator Wade. If you compare it to
7  Plaintiff's Exhibit 7, you'll see that it was sent
8  one second after Plaintiff's Exhibit 7. Do you see
9  that?
10    A    Yes.
11    Q    And this email has a subject line that
12  says Missing Juvenile; is that right?
13    A    Right.
14    Q    And it has an attachment to it. Do you
15  see that? I'm going to give you the attachment in
16  a second. But underneath the subject line it says
17  Attachments.
18    A    Yes.
19    Q    This is an email that the United Inn and
20  Suites received; is that correct?
21    A    Yes.
22    Q    Because it was sent, again, to the same
23  email address as Plaintiff's Exhibit 7?
24    A    Right.
25        (Plaintiff's Exhibit 9 marked)

Page 313

1  BY MR. BOUCHARD:
2    Q    I'm showing you Plaintiff's Exhibit 9
3  which is Bates stamped NBI 3107. This was attached
4  to the email Plaintiff's Exhibit 8 that we were
5  just looking at, Mr. Shareef. Did you open up that
6  email that we were just looking at and the
7  attachment to it when you received it in
8  October 2018?
9    A    I don't know. But I may have.
10    Q    Do you recall seeing this notice which is
11  Plaintiff's Exhibit 9?
12    A    No, I don't recall.
13    Q    Is this the first time you're seeing
14  this?
15    A    Yes.
16    Q    You have not seen this prior to today?
17    A    No.
18    Q    Do you know what BOLO stands for?
19    A    BOLO stand for?
20    Q    B-O-L-O.
21    A    BOLO stand for.
22    Q    Do you know what that means, BOLO?
23    A    I don't recall. But I may have sitting
24  in one of the Police, Sheriff, or maybe DeKalb
25  County Police meeting and we got some material

Page 314

1  about the -- some crimes. Maybe that's coming from
2  there. I don't recall.
3    Q    I can represent to you that it means be
4  on the lookout for. Is that new information to you
5  or is that something you're aware of?
6    A    No, I certainly don't call this
7  abbreviation -- don't recall this abbreviation.
8    Q    Recall this?
9    A    Abbreviation.
10        MR. UNDERRINER: Abbreviation.
11  BY MR. BOUCHARD:
12    Q    Abbreviation. But you see underneath
13  BOLO it says Missing Person?
14    A    Right.
15    Q    And you understand what that means?
16    A    Uh-huh.
17    Q    Right?
18    A    Yes.
19    Q    And it says that Rockdale County is
20  looking for this missing person, correct?
21    A    Yes.
22    Q    As of October 9th, 2018, correct?
23    A    Yes.
24    Q    And the email that you received from Tim
25  Wade, which is Plaintiff's Exhibit 8, was dated

Page 315

1  October 29th, 2018, right?
2    A    Yes.
3    Q    So at this point according to my math she
4  had been missing for about 20 days?
5    A    Yes.
6    Q    And it provides a photo of her?
7    A    Uh-huh.
8    Q    Is that correct?
9    A    Uh-huh (affirmative).
10    Q    And remember, sir, we need audible yes or
11  nos.
12    A    Yes. I'm sorry about that.
13    Q    And it provides her name?
14    A    Yes.
15    Q    J.G., do you see that?
16    A    Yes.
17    Q    Who is J.G. in this lawsuit against
18  United Inn and Suites.
19    A    Yes.
20    Q    Do you understand that?
21    A    Yes.
22    Q    And it also provides her age, race, hair
23  color, eye color, height, and weight.
24    A    Yes.
25    Q    Do you see that?

16 (Pages 312 - 315)

30(b)(6) Tahir Shareef                                          May 2, 2023

A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 316

1     A   Yes.
2     Q   It says a little bit further down on
3  Plaintiff's Exhibit 9:  Anyone with information
4  about this case is asked to contact, and it
5  provides office, cell numbers, and a 24-hour number
6  to contact.  Do you see that?
7     A   Yes.
8     Q   If I heard you correctly, Mr. Shareef,
9  you have not ever seen Plaintiff's Exhibit 9 before
10  today; is that correct?
11     A   That maybe 2017 we will seen it when we
12  open the email.  I'm going to give you example.  I
13  don't know if that works or not.  There are few
14  missing person when police officer came.  We put it
15  in our office bulletin board, we put it there and
16  it stay there.  But I don't remember all these
17  names.
18     Q   How many missing person reports have you
19  received regarding minors?
20     A   Right.  Minors, I don't know about the
21  minor report.  But the missing person, I mean even
22  right now in my, you know, front desk we have maybe
23  ten pictures missing persons.
24     Q   Are any of them minors?
25     A   It could have been.  I don't know.  I

Page 317

1  don't recall right now.
2     Q   Well, I don't know what other notices you
3  may have at your front desk right now.  But
4  Plaintiff's Exhibit 9 identifies J.G., J.G. as a
5  minor --
6     A   Right.
7     Q   -- is that correct?
8     A   Yes.
9     Q   And she looks like a minor in this photo,
10  does she not?
11     A   I don't know.
12        MS. RICHENS:  Objection as to form.
13  BY THE VIDEOGRAPHER:
14     Q   Well, I'm asking for your perception,
15  Mr. Shareef.
16     A   I don't know.  I cannot say anything
17  about this.
18     Q   You have no opinion whatsoever?
19     A   No.
20     Q   You are responsible for the security at
21  the property; is that true?
22     A   Uh-huh (affirmative).  Yes.
23     Q   As the general manager?
24     A   Right.
25     Q   And your position is that you are totally

Page 318

1  unable to discern whether somebody looks like a
2  minor or not?
3        MR. UNDERRINER:  Object to the form.
4     A   Looking at this picture, yes.
5  BY MR. BOUCHARD:
6     Q   Based on this photo you cannot tell --
7     A   I cannot.
8     Q   -- if she looks like a minor?
9     A   I cannot.
10     Q   But you know that it says her current age
11  is 16?
12     A   I can read.
13     Q   Did you ever contact Investigator Wade?
14     A   I might have been.  I don't know what I
15  respond via email or anything, you know.  What
16  record, you know, they ask me if I had the record.
17  I must have send it to them whatever question they
18  have.
19     Q   It is okay if the answer is no or I don't
20  know.  My question was very straightforward.
21     A   Right.
22     Q   Did you ever contact Investigator Wade?
23     A   Again, I don't know.  Maybe I have been.
24     Q   You may have, you may have not?
25     A   Right.

Page 319

1     Q   You do not know; is that true?
2     A   I do not know.
3     Q   Do you have any knowledge of whether
4  Mr. Islam contacted Investigator Wade?
5     A   I don't think so.  But this inspector may
6  come back and, you know, talk to him.  I don't
7  know.
8     Q   Do you have a recollection of
9  Investigator Wade ever coming to the United Inn and
10  Suites?
11     A   No.
12     Q   You do not recall?
13     A   No.
14     Q   Mr. Shareef, do you agree with me that
15  there being a missing youth who is suspected of
16  being at the United Inn and Suites is a priority
17  matter?
18        MR. UNDERRINER:  Object to form.
19        MS. RICHENS:  Same objection.
20     A   I don't know how to answer that.
21  BY MR. BOUCHARD:
22     Q   As the owner and general manager, would
23  it concern you if a police officer called you and
24  said we have a credible lead that there's a missing
25  minor at your hotel?

17 (Pages 316 - 319)

Case 1:20-cv-05232-JPB    Document 127-4    Filed 01/18/24    Page 8 of 12
30(b)(6) Tahir Shareef                                    May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 320

1        MS. RICHENS: Objection as to form.
2    A   I mean they always come and they ask this
3 question.  And like I said, I give them the record,
4 I open the door.  If they says look I think, you
5 know, that such and such room we need to check.  So
6 I always help them.  But that's my concern, if
7 there is any, I help them.  So I don't know what --
8 how to answer you.  Concern me, of course concern
9 me and I help them solve the issue.
10 BY MR. BOUCHARD:
11    Q   Well, that's an answer.
12    A   Okay.
13    Q   Yes, it concerns you if there's --
14    A   Okay.
15    Q   -- a missing minor at the hotel?
16    A   Okay.
17    Q   Is that correct?
18    A   Yes.
19    Q   Would you want to it concern the staff at
20 the hotel too?
21    A   Yes.
22    Q   Would you train your staff to care about
23 things like that?
24    A   Yeah.  They have -- they have known, you
25 know, if they see some suspicious thing, they tell

Page 321

1 me.  I talk to other -- you know, they can call the
2 police, you know, or they call 911 or they tell me,
3 I call my police officer.  Most the time call the
4 local police.
5        MS. RICHENS: David, may we take a quick
6 break?
7        MR. BOUCHARD: Sure.
8        THE VIDEOGRAPHER: Off the record at
9 2:29 p.m.
10        (Recess 2:29-2:41 p.m.)
11        THE VIDEOGRAPHER: Back on the record at
12 2:41 p.m.
13        (Plaintiff's Exhibit 10 marked)
14 BY MR. BOUCHARD:
15    Q   Mr. Shareef, I'm handing you what's been
16 marked as Plaintiff's Exhibit 10 which is Bates
17 stamped NBI 3097 to 3098.  Do you see that,
18 Mr. Shareef?
19    A   Yes.
20    Q   And you see it is another email from
21 Investigator Tim Wade on October 29th, 2018?
22    A   Yes.
23    Q   And it is also to
24 unitedinn4649@gmail.com?
25    A   Right.

Page 322

1    Q   Did the hotel receive this email as well?
2    A   Yes.
3    Q   Did you review this email?
4    A   Yes.
5    Q   And you see it says Subject Missing
6 Person; is that right?
7    A   Right.
8    Q   And the body of the email says:  Ashar
9 was advised by her guardian that she was staying at
10 United Inn located at 4649 Memorial Drive.  Thank
11 you for your help.
12        Do you see that?
13    A   Right.
14    Q   And as you can see, there's an attachment
15 to Plaintiff's Exhibit 10 which is identical to the
16 BOLO notice that we already looked at.
17    A   Right.
18    Q   Do you recall that?
19    A   Right.
20    Q   Mr. Shareef, we have talked about three
21 emails from Investigator Wade on October 29th, 2018
22 and two BOLO notices.  What, if anything, did the
23 United Inn do in response to these emails and these
24 BOLO notices?
25    A   The response would be if I see this girl,

Page 323

1 we notify whoever is, you know, concerning about
2 this email, this time this Mr. T. Wade.  So that's
3 what it is.
4    Q   I can represent to you, Mr. Shareef, that
5 I did not see a response to Investigator Wade in
6 your emails.  Do you believe that you did respond
7 to Investigator Wade?
8    A   We may have communicated via phone with
9 Wade.
10    Q   Do you recall doing so?
11    A   No.
12    Q   Do you know if anybody else on behalf of
13 United Inn communicated with Investigator Wade?
14    A   I see this email name Ashar, so might
15 have talked to Ashar and Ashar talk to him.
16    Q   Did you ever communicate with Ashar about
17 his communication with Investigator Wade?
18    A   Maybe that time.  But I don't know.
19    Q   You don't recall as you --
20    A   No.
21    Q   -- sit here today?
22    A   No.
23    Q   Do you recall whether you held a staff
24 meeting to talk about these missing juvenile
25 notices?

18 (Pages 320 - 323)

30(b)(6) Tahir Shareef                                     May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 324

1    A    No.
2    Q    You did not hold one or you do not
3  recall?
4    A    I do not recall.
5    Q    Did you post a photo of J.G. at the
6  hotel?
7    A    I may have.  But I don't recall.
8    Q    Where would you have posted it?
9    A    Post it in the office where everybody
10  comes in every day.
11    Q    Where is that?
12    A    It is in the office.
13    Q    Are you talking about in the lobby?
14    A    No, not lobby.  In the office back, I can
15  say back of the office.
16    Q    Who goes in there every day?
17    A    All the employees go there.
18    Q    Would you have made an announcement to
19  all the employees that you have just posted this
20  new photo of a missing juvenile reported to be at
21  the hotel?
22    A    I don't recall.
23    Q    Did you send this photo of J.G. to
24  Sergeant Weber?
25    A    I may have, you know, talked with him the

Page 325

1  same night, you know, look at that, you know, photo
2  or something.  We may have talked.
3    Q    You do not recall?
4    A    I don't recall.
5    Q    What about Sergeant McClelland?
6    A    I don't recall.
7    Q    If you had sent it to either of those
8  gentlemen, you would have sent it to them by text
9  message; is that correct?
10    A    I sent them a text message or maybe I
11  called them and said look, when you come in, you
12  know, look at this picture, you know, see if you
13  see this, you know, person.
14    Q    Well, I can represent to you that I have
15  what I believe are your text messages from 2017 to
16  2019 with Weber and McClelland.  I have not seen a
17  text message with that photo.
18    A    Okay.
19    Q    Is there some other way you might have
20  sent her photo to Weber or McClelland or is there
21  no other way other than by text message?
22    A    I mean they come there every day, so we
23  just tell them look at this picture, you know, when
24  you come in.  Because maybe we didn't see such and
25  such person, you know, so we tell them look, you

Page 326

1  are there, so you look around and see if the person
2  you see.  Maybe they are around and sometime
3  they're not there, you know.
4    Q    Are you testifying to something that
5  might have happened or that you recall happening?
6    A    No.  No.  I am testifying that when any
7  picture --
8    Q    Well, I'm not talking about any picture.
9  I'm specifically asking do you recall sharing this
10  photo of J.G. with Weber and McClelland?
11    A    I may have tell them that look at that
12  board there, we put the picture there.  Other than
13  that I don't recall.
14    Q    You may have told them?
15    A    Yeah.
16    Q    But you may have not told them; is that
17  what you're saying?
18    A    I don't recall.
19    Q    You do not recall --
20    A    Yeah.
21    Q    -- if you told them?
22    A    Yeah.
23    Q    Correct?
24    A    I don't recall what I tell them is what I
25  am saying.

Page 327

1    Q    Is it possible you did not tell them
2  about this photo?
3    A    I don't know.
4    Q    I am taking it the answer is no because
5  we have beaten this drum about the security at the
6  hotel.  But I need to ask just to be sure.  Did the
7  hotel hire any additional security after receiving
8  this photo of J.G.?
9    A    No.
10    Q    Did the hotel ask Weber or McClelland to
11  work more than four hours per day after receiving
12  this photo of J.G.?
13    A    Hotel asked them to when they are, you
14  know, in the DeKalb County when they are in this
15  area, they come and, you know, visit more often
16  there daytime when they working on their regular
17  job, so they come visit, you know.
18    Q    Did the hotel ask them to work more than
19  four hours a day after receiving this photo of
20  J.G.?
21    A    No.
22    Q    Did you ask the DeKalb Police Department
23  to help the hotel implement prevention efforts
24  after receiving this photo of J.G.?
25    A    I don't recall.

19 (Pages 324 - 327)

30(b)(6) Tahir Shareef                                                    May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 344

1    Q    Yeah.  After you hired a lawyer, did you
2  decide whether or not to pay the fines that the
3  DeKalb County Code Enforcement Division had
4  assessed on the United Inn and Suites?
5    A    Right.
6    Q    And your decision was to pay the fines;
7  is that correct?
8    A    Yes.
9       (Plaintiff's Exhibit 15 marked)
10 BY MR. BOUCHARD:
11   Q    Showing you Plaintiff's Exhibit 15, which
12 is Bates stamped NBI 2431 to 2432.  Mr. Shareef,
13 Plaintiff's Exhibit 15 is on page 1 a Deferred
14 Sentencing Order and on page 2 a cashier's check.
15 Do you see that?
16   A    Yes.
17   Q    The Deferred Sentencing Order says in the
18 first paragraph -- well, actually let me back up.
19 The Deferred Sentencing Order says at the top In
20 the Magistrate Court of DeKalb County, State of
21 Georgia, State of Georgia versus Northbrook
22 Industries, Inc. d/b/a United Suites; is that
23 right?
24   A    That's right.
25   Q    Is that your hotel?

Page 345

1    A    Yes.
2    Q    And it says in the first paragraph of
3  this Deferred Sentencing Order:  The Defendant
4  having come before the Court today on the
5  above-referenced charges, has entered a plea of
6  guilty slash nolo and the Court has accepted the
7  Defendant's plea.  A final sentencing hearing in
8  this matter will be held at 2:00 p.m. on July 16th,
9  2018 in the Magistrate Court of DeKalb County
10 located at, and it provides the address.  As such,
11 the Defendant is hereby ordered to appear at said
12 sentencing hearing.
13      Do you see that?
14   A    Yes.
15   Q    The next paragraph says:  The Court is
16 currently considering sentencing the Defendant to
17 pay a fine and state-imposed fees totaling $60,345.
18 If the Defendant pled guilty or nolo and it elects
19 to pay the fine and fees under consideration as a
20 sentence to the Clerk of the Magistrate Court of
21 DeKalb County on or before the sentencing hearing,
22 the Court will impose the fine and fees as detailed
23 as the sentence in this case.
24      Do you see that?
25   A    Yes.

Page 346

1    Q    And as you said, you decided to pay the
2  fine --
3    A    Right.
4    Q    -- is that right?
5       And that is reflected on page 2 of
6  Plaintiff's Exhibit 15; is that correct?
7    A    Right.
8    Q    The cashier's check for $60,345?
9    A    Right.
10   Q    And your understanding was that that was
11 the fine for violations of the DeKalb County code?
12   A    Right.
13      (Plaintiff's Exhibit 16 marked)
14 BY MR. BOUCHARD:
15   Q    Showing you Plaintiff's Exhibit 16 which
16 I only printed one copy of.  Even I don't have a
17 copy of it because it is so voluminous.  But it is
18 Bates stamped NBI 971 to NBI 1228.
19      MS. RICHENS:  What's happening, is there
20 just the original?
21      MR. BOUCHARD:  Yeah.  I just said on the
22 record that I have only printed one because it is
23 258 pages.
24      MS. RICHENS:  Okay.
25

Page 347

1 BY MR. BOUCHARD:
2    Q    Mr. Shareef, I can represent to you that
3  on the first page of Plaintiff's Exhibit 16, you
4  should see reference to the word Receipt.  And what
5  I understand Plaintiff's Exhibit 16 --
6       MS. RICHENS:  May we take a quick look?
7       MR. BOUCHARD:  Yeah.
8  BY MR. BOUCHARD:
9    Q    Do you see on the first page of
10 Plaintiff's Exhibit 16 there's a reference to
11 Receipt?
12   A    Yes.
13   Q    And I understand Plaintiff's Exhibit 16
14 outlines the violations at the United Inn and
15 Suites of the DeKalb County code defined for each
16 of those violations and then on the very last page
17 tells you the total fine owed.
18   A    Right.
19   Q    So if you flip to page 258 of Plaintiff's
20 Exhibit 16, the very last page, you should see the
21 total amount of the fine is $60,345.
22   A    Yes.
23   Q    And you see the amount paid is $60,345?
24   A    Right.
25   Q    Which is what we just saw in the

24 (Pages 344 - 347)

30(b)(6) Tahir Shareef                                          May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 368

1    Q    Have you had a chance to review them?
2    A    I see them.
3    Q    Is this the total set of your text
4 messages with Mr. Weber?
5    A    Yes.
6    Q    So all of your communications by text
7 message with Mr. Weber from 2017 to 2019 are
8 reflected here?
9    A    Yes.
10    Q    All right.  If you look at page NBI 4061,
11 which is the second page, if you sent
12 Sergeant Weber a photo, that's what it would look
13 like, right?
14    A    Yeah.
15    Q    If you flip the page to 4062.  And you
16 asked on May 4th, 2017 for information about the
17 shooting in 142.  Do you see that on 5/4/2017?
18    A    Yes.
19    Q    And the first thing I wanted to ask you
20 was the date there is May 4th, 2017.  Do you see
21 that?
22    A    Yes.
23    Q    The date above that is January 29th,
24 2017.
25        Do you see that?

Page 369

1    A    Yes.
2    Q    So does that mean that you didn't
3 exchange any texts for the entire month of
4 February, March, April with Sergeant Weber?
5    A    I guess you're right.
6    Q    So about 90 days plus you did not send or
7 receive any text messages from Sergeant Weber; is
8 that right?
9    A    Right.
10    Q    And I think you had told me that
11 Sergeant Weber would not prepare reports
12 documenting what he had done on his shift; is that
13 right?
14    A    Right.
15    Q    He would not submit any written
16 documentation to you?
17    A    No.
18    Q    Or to the hotel?
19    A    No.
20    Q    And so unless there's a text message,
21 there's nothing in writing from him to you or the
22 hotel about his shift; is that right?
23    A    Right.
24    Q    Do you recall a shooting in room 142 in
25 May 2017?

Page 370

1    A    After looking at the messages, yes.
2    Q    What was the circumstances of that
3 shooting?
4    A    I don't know.  But I believe I heard,
5 because I'm almost above this room, and I heard,
6 you know, few gunfire.  And we call and also the
7 911.  And then I send him a message because I
8 didn't see him there.  Because I know he's coming
9 with the next, you know, hour, two hour, so I asked
10 him to check it.  And he came and -- I think he
11 came to the property.  And then he called the
12 police officer and I think he talked with them.
13    Q    And concluded that it was prostitution
14 related?
15    A    I am not hundred percent.
16    Q    Well, look at page NBI 4063, please,
17 where it says at the top:  So far all I know is
18 that it was prostitution related.
19        Do you see that?
20    A    Yeah.
21    Q    Do you agree it appears that he concluded
22 the shooting was related to prostitution in room
23 142?
24    A    Looking at the messages, yes, he
25 concluded that way.

Page 371

1    Q    Do you have any further understanding of
2 what caused that shooting in room 142?
3    A    No.  When he take over, then at the end
4 he just, you know, if we meet, he give me the
5 report what's going on or he send a message, you
6 know, this is what happened.
7    Q    It looks like your next text message with
8 him is a month later on June 4th; is that right?
9    A    June 4th, yeah.
10    Q    So it looks like about 30 days pass
11 before you have any further written
12 correspondence --
13    A    Right.
14    Q    -- with him?
15    A    Right.
16    Q    So you don't send him any messages about
17 what steps are you taking to try to prevent
18 commercial sex activity on the property; is that
19 right?
20    A    No, I don't send him that.  We talk about
21 it because we meet quite often, you know.  And
22 that's the year when I need to stay there and fix
23 those violations, so I was there, you know, more
24 and I see him or other officer.
25    Q    Were you not there as much in 2016?

30 (Pages 368 - 371)

-10

-10

-10

-10

-10

-10

-10

-10

-10

-10

-10

-10

-10

-10

-10

Case 1:20-cv-05232-JPB  Document 127-4  Filed 01/18/24  Page 12 of 12
30(b)(6) Tahir Shareef        May 2, 2023
A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites

Page 380

1  A  Yes.
2  Q  In the back parking lot --
3  A  Back parking lot --
4  Q  -- generally?
5  A  -- yes.
6  Q  What about Weber, is he generally in the
7  back or the front?
8  A  He is -- I see him, he is -- he park
9  always at the front.
10  Q  He always parks in the front?
11  A  Almost always, yes.
12  Q  Do you know why they do it differently?
13  A  I don't know.
14  Q  It is not something you have asked for?
15  A  No.
16  Q  They do that on their own?
17  A  Yeah.
18  Q  Mr. Shareef, when we talked in February I
19  had asked you about background checks of employees
20  at the United Inn and Suites.  I have not seen any
21  documents in your production showing background
22  checks on employees or workers or laborers or
23  independent contractors at the hotel.  I assume
24  that means there is no such documentation of
25  background checks?

Page 381

1  A  Well, I don't know.  I couldn't find
2  anything.
3  (Plaintiff's Exhibit 29 marked)
4  BY MR. BOUCHARD:
5  Q  Mr. Shareef, I'm showing you Plaintiff's
6  Exhibit 29, and this is Bates stamped NBI 625 to
7  NBI 631.
8  Do you see that?
9  A  Yes.
10  Q  This appears to be a compilation of
11  documents and articles, but it was produced to us,
12  the Plaintiffs, by Northbrook Industries, Inc.  So
13  can you tell me what this is, what these series of
14  documents are about human trafficking.
15  A  Yeah.  These are like I think -- I'm not
16  sure which -- what date but this is almost
17  happening on the -- when we got these violations
18  and we have few meetings with the DeKalb County
19  Police and the county Tourism Department.  And they
20  have some of the material given to us and then some
21  of the links, website they give it to us to read
22  the material and share with the staff.  So this is
23  what I -- this is kind of my notes I can say.
24  Q  Help me understand that.  Did you bring a
25  computer and you typed these notes yourself or did

Page 382

1  you handwrite them and somebody typed this for you?
2  A  No.  No.  They gave us the -- I believe
3  they gave us some links, you know, click on these
4  links and go to certain website.  And some of them
5  I think they give them to us there and I retype it.
6  Because there are -- on those notes I see there's
7  lot of things repeated, so I type my basically own
8  notes plus some of the notes coming from the
9  websites.
10  Q  And you're saying that you think you
11  attended meetings related to the DeKalb County Code
12  Enforcement?
13  A  There was a meeting, you know,
14  collaboration with the Code Enforcement and the
15  Tourism, DeKalb County Tourism Department.
16  Q  Was this relating to the DeKalb County
17  Hotel, Motel Ordinance in 2017?
18  A  Yes.
19  Q  DeKalb County hosted meetings for DeKalb
20  hotel owners and operators to attend --
21  A  Right.
22  Q  -- to talk about the ordinance?
23  A  Yes.
24  Q  And at those meetings, is it more than
25  one meeting or just one meeting?

Page 383

1  A  I attend maybe two meetings.
2  Q  At those meetings at least one of the
3  topics was the ordinance for the hotels --
4  A  Right.  Right.
5  Q  -- in DeKalb County --
6  A  Uh-huh (affirmative).
7  Q  -- that the DeKalb County commission was
8  talking about passing?
9  A  Right.
10  Q  And another topic was human trafficking?
11  A  Yes.
12  Q  Were there other topics at these
13  meetings?
14  A  Other topics are how to go into their --
15  in their website, register yourself, you can get
16  more customers so they can expose you with the
17  other events in the DeKalb County so you can find
18  groups coming from the other cities to have their
19  family gathering or whatever their visit, visitors
20  who are contacting them.  So it is basically
21  helpful to find more customers, so these are the
22  topics there.
23  Q  The DeKalb County Tourism Department was
24  trying to help hotels develop business?
25  A  More business, yes.

33 (Pages 380 - 383)