CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 34

1  you're there?
2      A.  That is right.
3      Q.  Are you working 40-hour weeks, or would
4  you say you're working more than that because you're
5  living there?
6      A.  Working more than that.  Yeah.
7      Q.  So we're talking about, basically, the
8  last 20 years, 17 years you've been at the United Inn
9  and Suites a lot.
10     A.  Yes.
11     Q.  Would you say that anybody's been at the
12 property more than you during that time period?
13     A.  When you say "anybody," I -- I don't know
14 what you talking about.
15     Q.  Well, any other person, any other person
16 who works at the United Inn and Suites.  Has anybody
17 been at the property for longer than you have?
18     A.  No.
19     Q.  Would you say you're more knowledgeable
20 about the property than anybody else?
21     A.  Yes.
22     Q.  Because you've spent more time there than
23 anybody else has?
24     A.  Yes.
25     Q.  You know better than anybody else does,

Page 35

1  then, I take it, the staff at the hotel from 2017 to
2  2019?
3      A.  Yes.
4      Q.  The guests at the property during that
5  period?
6      A.  Yes.
7      Q.  The police officers who came by the
8  property during that period?
9      A.  Yes.
10     Q.  How did you come to know Tahir -- I'm
11 sorry.  How did you come to know Ashar Islam?
12     A.  He's a family member.
13     Q.  A family member of yours?
14     A.  Yes.
15     Q.  What is the family relationship?
16     A.  He is my nephew.
17     Q.  Nephew.  At -- at some point, he becomes
18 the registered agent for Northbrook Industries; is
19 that right?
20     A.  Yes.
21     Q.  Did you ask him to do that because he was
22 your nephew, or why did you ask him to do that?
23     A.  I don't know, but on one time -- I don't
24 know how that happened, but of course we ask him
25 that, you know, we need his name for the agent.  And

Page 36

1  he had no objection, so he said that's fine.  I don't
2  know why.
3      Q.  Who are the officers of Northbrook
4  Industries, Inc.?
5      A.  Myself and Sabharwal.
6      Q.  Anybody else?
7      A.  No.
8      Q.  And what's your title as an officer?
9      A.  The president.
10     Q.  Was it true in 2017 to 2019, that the only
11 officers of United Inn and Suites was you and
12 Mr. Sabharwal?
13     A.  Yes.
14     Q.  Is the United Inn and Suites a chain?
15     A.  No.
16     Q.  Is it affiliated with any other hotels?
17     A.  I used to have another hotel called United
18 Inn and Suites in Macon, Georgia.
19     Q.  When was that?
20     A.  Since 2012 through 2021.
21     Q.  From 2012 to 2021, you had a property
22 called the United Inn and Suites in Macon, Georgia?
23     A.  Yes.
24     Q.  And you were the owner of that hotel?
25     A.  Yes.

Page 37

1      Q.  With Mr. Sabharwal?
2      A.  No.
3      Q.  Sole owner?
4      A.  Yes.
5      Q.  And I assume you identified that property
6  through a broker again?
7      A.  Yes.
8      Q.  Was there a relationship between the
9  United Inn and Suites in Macon and the United Inn and
10 Suites in Decatur?
11     A.  On -- on what relation?  On what basis?
12     Q.  Well, they had the same name.
13     A.  Right.
14     Q.  So did they share employees?
15     A.  No.
16     Q.  Did you work at both hotels?
17     A.  Yes.
18     Q.  Did Mr. Shareef work at both hotels?
19     A.  Who?
20     Q.  Did Mr. Islam work at both hotels?
21     A.  No.
22     Q.  Does your wife work at the United Inn and
23 Suites?
24     A.  Yes.
25     Q.  So when she travels with you from

10 (Pages 34 - 37)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 46

1    Q.   -- you owned it?
2    A.   You can say manager, too.
3    Q.   And you also received training on hotel
4  operations through AAHOA?
5    A.   Yes.
6    Q.   When did you receive the training on hotel
7  operations from AAHOA?
8    A.   That is on and off. Whenever they offer a
9  training and it's the time permitted on the --
10 sometime the training is for a few months, sometimes
11 it's few weeks, but on and off, they offer a training
12 session. And I took the advantage.
13   Q.   Was that in person or online?
14   A.   At that time, it was on -- not online. It
15 was all in person.
16   Q.   So when is the last time that you
17 participated in a training on running a hotel?
18   A.   I can say maybe 2002.
19   Q.   So, since 2002, you do not believe you
20 have participated in any trainings on running hotels?
21   A.   The training, I -- I participate in
22 meeting with the DeKalb County. And they have
23 presented, you know, some of the rules and
24 regulation, you know, and the little bit talk about
25 staff training and the safety procedure of the hotels

Page 47

1  in the DeKalb County. And that is meetings for half
2  a day. And this only couple of times.
3    Q.   Who in DeKalb County provided those
4  trainings?
5    A.   The DeKalb County. I believe that's
6  DeKalb County some -- I think they call it tourism
7  department.
8    Q.   Are you saying that you think you attended
9  more than one half-day training with the DeKalb
10 County Tourism Department?
11   A.   Yes.
12   Q.   And would that have been after 2002?
13   A.   Yeah, in 2000 -- maybe '13, '14, something
14 like that.
15   Q.   Do you recall who led those trainings?
16   A.   No.
17   Q.   Have you ever participated in any
18 trainings led by the DeKalb County Police Department?
19   A.   There was a police department there at the
20 training. They have police chief and they have bunch
21 of other police officer there. And they talk about
22 it.
23   Q.   Do you have any documents from any of the
24 trainings that you attended?
25   A.   They -- they give you handout, so I have

Page 48

1  those.
2    Q.   You do have those?
3    A.   Yeah.
4    Q.   Where are those? Are they at your house
5  or are they at the hotel or...
6    A.   No, they are at the -- at the business.
7  But we kind of, you know, take whatever the bullets
8  point and have our own, kind of, guidelines.
9    Q.   Because those have not been provided in
10 discovery, so I'm just trying to understand if you
11 know why that would be.
12   A.   Because they are bunch of handouts, and we
13 had our -- well, like our own, kind of, guidelines.
14 So we are using that.
15   Q.   Other than you wife, Ashar Islam, and Saad
16 Iqbal, are there any other family members of you,
17 Tahir Shareef, whoever worked at the United Inn and
18 Suites in Decatur?
19   A.   No.
20   Q.   It's only those three?
21   A.   Right.
22   Q.   And let's take 2017 as an example,
23 Mr. Shareef. When you were at the property in 2017,
24 who -- how many people would be working during any
25 given shift?

Page 49

1    A.   Each shift has one person at the front
2  desk, and then bunch of housekeepers, and the
3  maintenance person, and the cleaning staff, the
4  ground cleaning staff.
5    Q.   That sounds like a lot of people working
6  during a shift.
7    A.   Yes.
8    Q.   And so how many people is that?
9    A.   Any given shift, we have five
10 housekeepers, one front desk person, and one cleaning
11 staff taking care of the yard work.
12   Q.   So at any given point in time, there would
13 be seven people working during a shift?
14   A.   In the daytime, yes.
15   Q.   In the daytime shift?
16   A.   Yes.
17   Q.   What about during the nighttime shift?
18   A.   Nighttime, there is only one person who
19 work at the front desk. And the -- the police
20 officer come late at night.
21   Q.   So, the nighttime shift would be one hotel
22 staff member at the front desk.
23   A.   Right.
24   Q.   And then for a certain portion of the
25 night, a police officer; is that correct?

13 (Pages 46 - 49)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 50

1    A.    Yes.
2    Q.    Anybody else working at the hotel?
3    A.    No.
4    Q.    And we've already established that during
5  the nighttime, the hotel lobby's shut down, so the
6  person working would be working behind the window?
7    A.    That's right.
8    Q.    When your wife and your nephews have
9  worked at the United Inn and Suites, I assume that
10 you're the one supervising them; is that right?
11   A.    Yes.
12   Q.    There's not somebody else who supervises
13 them because they're you're family members?
14   A.    Ashar is there to supervise also.
15   Q.    But they're his family members, too,
16 right?
17   A.    Yeah.
18   Q.    When -- looking at 2017 to 2019, and
19 focusing on that time period, Mr. Shareef, during
20 that time window, did you have responsibility for
21 training staff at the United Inn and Suites?
22   A.    Yes.
23   Q.    Did Mr. Islam have responsibility for
24 that, too?
25   A.    Yes.

Page 51

1    Q.    And you, earlier, outlined your
2  responsibilities at the hotel generally.  And you
3  said they included monitoring the property,
4  supervising staff, and you listed some other items.
5  Would you say that Mr. Islam's responsibilities were
6  identical to yours when he was working?
7    A.    Yes.
8    Q.    What's your understanding of why we're
9  here today, Mr. Shareef?
10   A.    To answer your questions, I guess.
11   Q.    Well, do you have an understanding of why
12 I noticed your deposition for today and what the
13 lawsuits in these cases are about?
14   A.    Yes.  It's -- there are three girls,
15 they -- you know, they sue us that they are living
16 sometime at the property.
17   Q.    Do you understand why they've sued?
18   A.    I don't know how to answer that.  I mean,
19 I -- I -- I don't know how to answer that.
20   Q.    Well, do you have an understanding of what
21 they're alleging happened at the property?
22   A.    Yes, I understand that.
23   Q.    What is it that you understand they've
24 alleged happened to them that property?
25   A.    Says they are minor and they are doing

Page 52

1  prostitution there.
2    Q.    What do you consider prostitution?
3         MR. STORY:  Object to the form.  You
4    can answer.
5         THE WITNESS:  I -- I -- I don't know
6    if prostitution, a common word, I guess.
7    Q.    (By Mr. Bouchard) What does it mean to
8  you?
9    A.    Prostitution, they take money for the sex.
10   Q.    Are you familiar with the term sex
11 trafficking?
12   A.    I -- I read through the -- some papers
13 says sex trafficking.
14   Q.    What do you understand that term to mean?
15   A.    Meaning the prostitution, you know, same
16 thing.
17   Q.    Do you think there's a difference between
18 prostitution and sex trafficking?
19   A.    I don't --
20        MR. STORY:  Object to the form.  You
21   can answer.
22        THE WITNESS:  -- think so.
23   Q.    (By Mr. Bouchard) When did you first heard
24 -- hear the term "sex trafficking"?
25   A.    You know, see news, here and there, you

Page 53

1  know, about the sex trafficking.
2    Q.    So you have heard the term prior to this
3  lawsuit, I take it?
4    A.    Yeah, yeah.  It shows -- like I said,
5  there was a -- the meetings with the DeKalb County,
6  so this thing come up, you know, sex trafficking and
7  prostitution.
8    Q.    Were those topics discussed at the DeKalb
9  County trainings that you attended?
10   A.    I believe so, yes.
11   Q.    Do you remember what was said about those
12 topics?
13   A.    Yes.  The people, you know, use the hotel
14 to rent a room and do the prostitution there.
15   Q.    So by 2017, did you understand that hotels
16 were places used for prostitution and sex
17 trafficking?
18   A.    Yes.  I can say yes.
19   Q.    Did the trainings through DeKalb County
20 provide you with signs and red flags and things to
21 look for that would indicate victims of sex
22 trafficking on your hotel property?
23   A.    Yes, that was a part of that, you know,
24 conversation.
25   Q.    What did you understand those signs and

14 (Pages 50 - 53)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 54

1  red flags and indicators of sex trafficking to be?
2      A.  For me, I believe it's the same as a, you
3  know, prostitution.  Sex trafficking is the same.
4      Q.  And I heard you say that earlier.  I'm
5  asking a slightly different question.
6      A.  Uh-huh.
7      Q.  I think you said that at the DeKalb County
8  trainings, one of the things they discussed in the
9  trainings was things that you could look for as a
10  hotel owner and observe with your -- with your
11  eyes --
12      A.  Right.
13      Q.  -- to make an assessment as to whether or
14  not somebody may be a victim of sex trafficking.  And
15  I thought you said yes, that that was an aspect of
16  the training.
17      A.  Uh-huh.
18      Q.  Is that correct?
19      A.  Yeah.
20      Q.  So what did they tell you about what you
21  could look for with your eyes that would be an
22  indication that somebody is a victim of sex
23  trafficking?
24      A.  Yeah, it was told that, you know, somebody
25  coming and complain to you, you go and, you know,

Page 55

1  call the police, DeKalb County police, and just
2  direct to them that this person is complaining.  Or
3  if you observe that there's a -- in any particular
4  room, there are people, you know, going in and out
5  more than they're supposed to and you check it, and
6  then, you know, if it's necessary, then call the
7  police.
8      Q.  Anything else that you recall about the
9  trainings?
10      A.  That's kind of it.
11      Q.  I'm showing you what's been marked as
12  Plaintiff's Exhibit 2, which is Bates-stamped
13  Plaintiff 24763 to 24768.
14          (Exhibit No. 2 was marked for
15          identification.)
16      Q.  (By Mr. Bouchard) Do you see what I've
17  just handed you, Mr. Shareef?
18      A.  Yes.
19      Q.  And do you see the first page at the top
20  also says, Blue Campaign?
21      A.  Uh-huh.
22      Q.  Do you see that in the middle of the first
23  page, it says Hospitality Toolkit?
24      A.  Right.
25      Q.  And then do you see on the bottom left of

Page 56

1  the first page, it says, Who we are.  The Blue
2  Campaign is the unified voice for the U.S. Department
3  of Homeland Security's efforts to combat human
4  trafficking.  Working with law enforcement,
5  government, and nongovernmental and private
6  organizations, the Blue Campaign strives to protect
7  the basic right of freedom and bring those who
8  exploit human lives to justice.  Do you see that?
9      A.  Uh-huh.
10      Q.  Are you familiar with the Blue Campaign?
11      A.  Not on this one, no.
12      Q.  If you take a look at the second page of
13  Plaintiff's Exhibit 2, do you see that there are
14  three bullet points in the top half of the page?
15      A.  Uh-huh.
16      Q.  One also says sex trafficking --
17      A.  Uh-huh.
18      Q.  -- do you see that?
19      A.  Yes.
20      Q.  And I want to read to you what it says
21  under sex trafficking.  It says, Victims of sex
22  trafficking are manipulated or forced to engage in
23  sex acts for someone else's commercial gain.  Sex
24  trafficking is not prostitution.
25          Do you see that?

Page 57

1      A.  Yes.
2      Q.  Do you agree with that?
3      A.  Yes.
4      Q.  You're not disputing what the Department
5  of Homeland Security says in this Blues campaign --
6      A.  No.
7      Q.  -- statement, right?
8      A.  I agree with that.
9      Q.  And do you see in the next section here it
10  says, Anyone under the age of 18 engaging in
11  commercial sex is considered to be a victim of human
12  trafficking.
13          Do you see that?
14      A.  Yes.
15      Q.  And then you see it says in bold, No
16  exceptions?
17      A.  Yes.
18      Q.  Do you see that?
19      A.  Uh-huh.
20      Q.  Do you agree with that?
21      A.  Yes.
22      Q.  You're not saying that you have a
23  different view on sex trafficking than what's stated
24  in this form right here?
25      A.  Huh-uh.

15 (Pages 54 - 57)

Page 58

1    Q.   Is that correct?
2    A.   Yes.
3    Q.   So do you agree that anyone under the age
4    of 18 engaging in commercial sex is a victim of human
5    trafficking?
6    A.   Yeah, I agree.
7    Q.   Do you agree that sex trafficking is not
8    prostitution?
9    A.   Yeah, I agree it says.
10   Q.   Do you understand that the plaintiffs in
11   each of these cases, J.G, A.G., and G.W., were under
12   the age of 18 at the time that they were at the
13   United Inn and Suites?
14   A.   I understand that.
15   Q.   And do you understand that each of those
16   three young women have alleged that they were engaged
17   in commercial sex activity at the hotel?
18   A.   That's what they, yeah, alleging, yes.
19   Q.   Are you saying that's not true?
20   A.   No, but I don't know.  I find out, you
21   know, when see this lawsuit.  But I don't know at
22   that time, no.
23   Q.   I assume you would defer to the
24   conclusions of law enforcement and a judge --
25   A.   Yes.

Page 59

1    Q.   -- as to whether or not they were sex
2    trafficked?
3    MR. STORY:  Object to the form.  You
4    can answer.
5    THE WITNESS:  I -- I -- I don't know
6    that time about this case.  These people
7    never come to me, you know, so I don't have
8    any knowledge.
9    Q.   (By Mr. Bouchard) You don't know one way
10   or another if they were sex trafficked at the hotel.
11   Is that what you're saying?
12   A.   Yes.
13   Q.   Mr. Shareef, the -- the time period that
14   we're focusing on in today's deposition is 2017 to
15   2019.  I may ask you questions about other time
16   periods, but I'd like to really focus in on those
17   years.
18   A.   Okay.
19   Q.   During that time period, that is 2017 to
20   2019 --
21   A.   Uh-huh.
22   Q.   -- would you say that it was true or false
23   that the United Inn and Suites had a high level of
24   crime?
25   A.   I -- I can say that I find -- find it, you

Page 60

1    know, that the -- when I see your report.  But, of
2    course, we have this area that's a pretty high crime
3    area.
4    Q.   And I'm not -- I appreciate the answer.
5    I'm not asking generally about Memorial Drive or
6    DeKalb County as a whole, or even metro Atlanta.
7    A.   Uh-huh.
8    Q.   I'm asking specifically about the United
9    Inn and Suites at 4649 Memorial Drive.
10   A.   Uh-huh.
11   Q.   Did that hotel, in your opinion, from 2017
12   to 2019, have a high level of crime?
13   MR. STORY:  Object to the form.  You
14   can answer.
15   THE WITNESS:  I have -- you know, I
16   have found out, you know, after that, you
17   know, when I see those reports.  Because I
18   can say that, you know, we -- you know,
19   when we need the police officer for any
20   type of help, so I believe we call almost
21   two calls a week, maybe three calls a week.
22   But the list, what I see there, this is --
23   happened after, you know, the something
24   happened.  I did not know most of these
25   incidents.

Page 61

1    Q.   (By Mr. Bouchard) When you say "the list,"
2    what list are you referring to?
3    A.   I see a list about the, you know, the --
4    something happened in -- back in June 2018, something
5    happened in July '19.  So the cases, they -- the date
6    of some incident happened.
7    Q.   Are you talking about the complaints --
8    A.   The complaint.
9    Q.   -- of these lawsuits?
10   A.   Not the complaints of these lawsuits.
11   Q.   You're talking about a different document?
12   A.   Not the different document.  I see a list
13   of -- bunch of, you know, reports.
14   Q.   The police reports?
15   A.   It says -- that was -- is a list.  I don't
16   know.  I see that one.
17   MR. STORY:  He's referring to
18   Requests for Admissions.
19   MR. BOUCHARD:  Oh, okay.
20   MR. STORY:  That you sent.
21   MR. BOUCHARD:  Okay.
22   MR. STORY:  -- and the list of the
23   prior crimes that --
24   MR. BOUCHARD:  Understood.
25   MR. STORY:  -- have been --

16 (Pages 58 - 61)

CONF Tahir Shareef                     February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 62

1        MR. BOUCHARD: Okay.
2        MR. STORY: -- admitted. That's
3    when -- he's referring to the list --
4        THE WITNESS: Yeah, that's -- that's
5    the one. Yeah.
6        MR. BOUCHARD: Okay.
7        MR. STORY: Correct me if I'm wrong,
8    but that is --
9        MR BOUCHARD: Thanks, Will. Yeah.
10       MR. STORY: -- what he -- sorry, I'm
11   not trying to --
12       MR. BOUCHARD: No, no.
13   Q.   (By Mr. Bouchard) So discovery request
14   that we sent --
15   A.   Right.
16   Q.   -- in this case or these cases, that's the
17   list you're talking about?
18   A.   Yes, that is.
19   Q.   Okay.
20   A.   That's --
21   Q.   Got it. From 2017 to 2019, is it your
22   opinion that activities like prostitution were common
23   at the United Inn and Suites?
24       MR. STORY: Object to the form. You
25   can answer.

Page 63

1        THE WITNESS: After looking at that
2    report, I can say yes. I don't know.
3    Q.   (By Mr. Bouchard) Well, you're saying
4    after looking at that report, but you've told me,
5    Mr. Shareef, that in 2017 and 2019, you were spending
6    15 to 25 days at the hotel.
7    A.   Right.
8    Q.   Every month?
9    A.   Yes.
10   Q.   And that you were working more than
11   40 hours a week because you were living at the hotel?
12   A.   Yes.
13   Q.   And your wife, oftentimes, was with you
14   also working at the hotel?
15   A.   Yes.
16   Q.   And you had multiple family members
17   working at the hotel, right?
18   A.   Yes.
19   Q.   And you talked to staff who you supervised
20   about the operations at the property, right?
21   A.   Yes.
22   Q.   So I'm not asking you to take my list for
23   it. I'm asking for your observations during that
24   time, either based on conversations you had with your
25   wife or Saad Iqbal or Ashar Islam, or any other staff

Page 64

1    member, or based on something that you yourself
2    observed.
3        Did you believe that from 2017 to 2019,
4    that activities like prostitution were common at the
5    United Inn and Suites?
6        MR. STORY: And can I just get a
7    clarification of when are we talking about
8    his knowledge. His knowledge right now or
9    his knowledge in 2019?
10   Q.   (By Mr. Bouchard) Well, you can answer
11   however you see fit.
12   A.   I can say I'm not aware of it.
13   Q.   You're not aware of it?
14   A.   Yeah.
15   Q.   So your testimony is, I was not aware of
16   there being any prostitution at the United Inn and
17   Suites from 2017 to 2019?
18       MS. WARD: Objection --
19       THE WITNESS: At that time.
20   Q.   (By Mr. Bouchard) At that time?
21   A.   Yeah.
22   Q.   That's your testimony?
23   A.   Yeah.
24   Q.   Under oath?
25   A.   Yeah.

Page 65

1    Q.   You had no knowledge of any prostitution
2    at the hotel?
3    A.   No.
4    Q.   And would your wife's testimony, do you
5    believe would it be the same?
6    A.   Yes.
7    Q.   Do you believe there would be staff
8    members at the hotel who would testify differently?
9    A.   I don't know, but -- I don't know how
10   they...
11       (Exhibit No. 3 was marked for
12   identification.)
13   Q.   (By Mr. Bouchard) Showing you what's been
14   marked as Plaintiff's Exhibit 3. You see that this
15   is a PowerPoint prepresentation from Luz Borrero, who
16   I can represent to you, Mr. Shareef, was the deputy
17   operating officer for development for DeKalb County.
18   You see that on the first page of Plaintiff's
19   Exhibit 3?
20   A.   Yes.
21   Q.   Do you know Ms. Borrero?
22   A.   No.
23   Q.   She's now involved with running MARTA for
24   the City of Atlanta, so she's gotten some promotions
25   along the way. But in 2015, she was working in

17 (Pages 62 - 65)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 70

1    Q.    And it says, Some of these properties have
2    become a convenient haven for criminal activities.
3    Do you see that?
4    A.    Yes.
5    Q.    Do you believe that the United Inn and
6    Suites became a convenient haven for criminal
7    activities?
8    A.    I -- I don't know.  I -- I don't believe
9    so.
10   Q.    Did you ever ask the DeKalb County Police
11   Department what their view of the hotel was?
12   A.    I ask my police officer when -- all the
13   time, you know.
14   Q.    Your police officer?  What do you mean by
15   that?
16   A.    Meaning the -- the two police officer,
17   they are working for me for the longer period of
18   time.
19   Q.    What are their names?
20   A.    One is Officer McClelland, and the other
21   one is officer Webber.
22   Q.    When did they work for you?
23   A.    They work every day.  Every night.
24   Q.    Yeah, but during what time period?
25   A.    They are -- they are there at nighttime,

Page 71

1    you know.
2    Q.    Well, I'm asking during what years.
3    A.    Oh, what year.  Oh, what year.  They are
4    working since -- I always have police officer, but
5    these two, they are here longer days.  I think they
6    are here since 2016.
7    Q.    So, you would ask Officer McClelland and
8    Officer Webber about their perspectives on the hotel
9    property?
10   A.    Right.  Right.
11   Q.    Were they off-duty DeKalb County Police
12   Department officers?
13   A.    They are off duty, yeah, I think so.  But
14   they usually come in their uniform.  I don't know how
15   to consider off duty, but --
16   Q.    Did they work for the DeKalb County Police
17   Department?
18   A.    Yes.
19   Q.    Did you have a contract with these
20   gentleman or how -- how did you find them?
21   A.    I just hire them.  They come and work for
22   me.
23   Q.    You paid them directly?
24   A.    I paid them directly.
25   Q.    There was not a company, a security

Page 72

1    company that you hired?
2    A.    No.
3    Q.    You just paid these gentlemen, correct --
4    A.    Yes.  Yes.
5    Q.    Did you just pay them cash?
6    A.    I pay them check.  Yeah, check.
7    Q.    Did you have a written contract with them?
8    A.    No.
9          MR. STORY:  And David, I don't want
10   to --
11         MR. BOUCHARD:  Yes.
12         MR. STORY:  -- interrupt at a bad
13   time, we've been going a little over an
14   hour.  If we can take a five minute break
15   -- we don't have to do it now, but once you
16   get to the --
17         MR. BOUCHARD:  Yeah, sounds good.
18   Q.    (By Mr. Bouchard) Let's look at slide 11
19   on Plaintiff's Exhibit 3, Mr. Shareef.  It calls out
20   the United Inn and Suites here.  And in the bottom
21   right-hand corner, it talks about code violation
22   notes.  Do you see that?
23   A.    You said bottom which corner?
24   Q.    Bottom right-hand corner.
25   A.    Oh, right.  Yeah.  Okay.

Page 73

1    Q.    And it says, Interior and exterior
2    structure problems; is that right?
3    A.    Yes.
4    Q.    And it says, Roach, rat infestation?
5    A.    Yes.
6    Q.    Did the hotel have a roach/rat
7    infestation?
8    A.    I know I have roach, but I don't know
9    where the rat come from.  But I have roaches problem.
10   Q.    During the time that we're focused on,
11   which is 2017 to 2019, is it your opinion that the
12   hotel, that is the United Inn and Suites, regularly
13   violated DeKalb County codes?
14   A.    Yes.
15   Q.    Like health codes?
16   A.    Yeah.
17   Q.    All right.  Let's --
18   A.    If I can say one thing here.
19   Q.    Sure.
20   A.    They have -- they have one inspection on
21   that period.  And it's like a -- it's not regularly,
22   it's like once-a-year inspection.  And that time,
23   they wrote a bunch of tickets.
24   Q.    How often would the county come out to
25   inspect for code violations?

19 (Pages 70 - 73)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 78

1  violations. They should not even write it.
2      Q.  So how many do you think were legitimate
3  violations?
4      A.  Maybe 10, 15.
5      Q.  10 -- 10 or 15 out of 447?
6      A.  Yeah.
7      Q.  But you paid $60,345 anyway?
8      A.  Yes.
9      Q.  Did you object to the code violation
10  assessments, or did you agree that you were
11  responsible?
12      A.  I objected.
13      Q.  But you decided to pay the full fine
14  violation anyway?
15      A.  Yes.
16      Q.  Do you have an explanation for why the
17  code enforcement at DeKalb County would have been
18  citing your hotel improperly?
19          MR. STORY:  Objection. You can
20      answer.
21          THE WITNESS:  I don't have what they
22      have in mind.
23      Q.  (By Mr. Bouchard) Are you saying that you
24  think the DeKalb County Code Enforcement team was
25  improperly citing your hotel for code violations?

Page 79

1      A.  Yes, sir.
2      Q.  Who do you think was responsible for
3  improperly citing your hotel?
4      A.  Whatever they did that year and next year,
5  that's totally unfair. Totally unfair.
6      Q.  Do you know the names of the people?
7      A.  I have the names, but nothing I can do.
8      Q.  Well, what are the names?
9      A.  I have bunch of name there.
10      Q.  Where?
11      A.  At my office. They left their business
12  card and stuff. And bunch of them are fired.
13  They're not -- no longer working at the code
14  enforcement.
15      Q.  How do you know that they were fired?
16      A.  Because I find out they're not coming
17  anymore.
18      Q.  You recognize that because somebody's not
19  coming anymore doesn't necessarily mean they were
20  fired.
21      A.  Well, I -- I did kind of find out they're
22  not there, but I have no proof.
23      Q.  I'm showing you what's been marked as
24  Exhibit 5.
25          (Exhibit No. 5 was marked for

Page 80

1      identification.)
2      Q.  (By Mr. Bouchard) This is a -- Plaintiff's
3  Exhibit 5 is an AJC article, an Atlanta Journal
4  Constitutional article, entitled DeKalb News,
5  Extended Stay Hotel Inspections lead to 2,397
6  citations.
7          Do you see that?
8      A.  Yes.
9      Q.  And there's a portion of this article that
10  talks about the United Inn and Suites. If you go to
11  page 2 of the article towards the bottom, the second
12  --
13      A.  Page number?
14      Q.  Page 2?
15      A.  2, okay.
16      Q.  The second to last paragraph towards the
17  bottom of the page starts with "The worst offender."
18      A.  Uh-huh.
19      Q.  Was United Inn and Suites in Decatur,
20  which paid $60,345 in fines after receiving 447
21  citations last year. It was among four hotels along
22  Memorial Drive that made the list.
23          Do you see that?
24      A.  Yes.
25      Q.  Are you aware of whether you had guests

Page 81

1  complain to DeKalb County about the conditions of the
2  hotel?
3      A.  Had guest complain to DeKalb County. I --
4  I know the -- you know, like a -- I can say, the
5  prior year, 20, you know, '16 or '14, or '15, maybe
6  the inspector come once or twice a year, those extra
7  when guest complain, to the DeKalb County. And they
8  came and checked the room for some, you know -- or
9  some roaches violation or maybe leaky faucet.
10      Q.  Have you ever been trained on the DeKalb
11  County code?
12      A.  Trained on DeKalb County codes?
13      Q.  Yeah.
14      A.  No.
15      Q.  I mean, are you saying that you are an
16  expert in the DeKalb County codes that the
17  enforcement team was assessing compliance with --
18      A.  Well, I'm not expert, but I -- I totally
19  disagree with them.
20      Q.  I want to look back at Plaintiff's
21  Exhibit 3, which is this PowerPoint presentation we
22  looked at from Luz Borrero with the Office of
23  Development in DeKalb County. And slide seven, which
24  we looked at in Plaintiff's Exhibit 3 -- you with me?
25      A.  Yes.

21 (Pages 78 - 81)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 94

1    And that's the time we bring some calm to the -- to
2    the area.
3        Q.   Why not have a security guard for the
4    other 20 hours a day?
5        A.   Because like I said, I am there or someone
6    there to observe.  And if we -- you know, if we need
7    help, we call the DeKalb County police.
8        Q.   But you told me that you typically worked
9    the day shift, which is what hours, sir?
10       A.   From -- let's say from 6 a.m. to 2 p.m.
11   Sometimes it goes to late night.
12       Q.   So, from 9 p.m. until 6 a.m. is the night
13   shift, I thought is sort of the way you described to
14   me earlier.
15       A.   Yeah.
16       Q.   Is that true?
17       A.   Uh-huh.
18       Q.   Is that right?
19       A.   Right.
20       Q.   And it's from 9 p.m. to 6 a.m., you told
21   me, that there's generally one person working on the
22   property other than the security guard.
23       A.   Right.
24       Q.   And that one person working is behind the
25   window because the lobby's closed?

Page 95

1        A.   Right.
2        Q.   So when the security guard goes home at
3    2 a.m. --
4        A.   Uh-huh.
5        Q.   -- there is one human being working at the
6    property and they're behind a window --
7        A.   Right.
8        Q.   -- is that right?  True?
9        A.   Yes.
10       Q.   They're not walking around the property,
11   right?
12       A.   No, they walk around the property, you
13   know, on a needed basis.  They have the camera system
14   there, we have bunch of cameras, and they can watch
15   the cameras.  And they can see something, somebody
16   standing outside, out of -- they look someone who is,
17   you know, they think is not a guest, they, you know,
18   tell them to, you know, leave the property.
19       Q.   So, how many hours a day is there one
20   person working at the United Inn and Suites?
21       A.   Are you asking a night shift person?
22       Q.   No.  I'm just asking how many hours in a
23   24-hour day is there one person working at the United
24   Inn and Suites.
25       A.   At the front desk, only one person working

Page 96

1    at the front desk.
2        Q.   No.
3        A.   Okay.
4        Q.   I think we're -- so, in a 24-hour day,
5    there's a day shift and there's a night shift --
6        A.   Yes.
7        Q.   -- right?
8        A.   Yes.
9        Q.   Right.  And the day shift always has more
10   than one person?
11       A.   Yes.
12       Q.   Right.  The night shift may only have one
13   person if the security guard's gone home.
14       A.   Right.
15       Q.   Is that correct?
16       A.   Yes.
17       Q.   And so from 9 p.m. until 10 p.m., the
18   security guard is not there; is that correct?
19       A.   10 p.m. to, like, a 9 a.m., yes, that's
20   right, security guard is not there.
21       Q.   9 to 10 p.m., the security guard is not
22   there --
23       A.   No, no, no.
24       Q.   From 9 p.m. --
25       A.   9 p.m.

Page 97

1        Q.   -- to 10 p.m., the security guard is --
2        A.   Yeah.
3        Q.   -- not at --
4        A.   Yeah.
5        Q.   -- the hotel?
6        A.   Yeah.
7        Q.   And from 2 a.m. to 6 a.m., the security
8    guard is not at the hotel, right?
9        A.   That's right.
10       Q.   We've been talking about staffing and
11   whether there's one person at the hotel.  Was all of
12   that true from 2017 to 2019?
13       A.   Yes.
14       Q.   So what we've been discussing about when
15   the security guard worked and when there was one
16   person at the front desk, that was true from 2017 to
17   2019?
18       A.   Yes.
19            MR. STORY:  And David, I just want
20       to provide a point of clarification here.
21       I think a little -- so there was a shift
22       change at some point post these events.
23       During these events, my understanding is
24       that there was three shifts.  There are
25       now, at United Inn, two shifts.

25 (Pages 94 - 97)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 110

1  you know, they need the watch out because they are
2  the police officer and they tell me, look, we check
3  the room, we talk with the people, and there is
4  nothing going on.
5      Q.  How many times do you think you had
6  conversations with the DeKalb police Department about
7  prostitution?
8      A.  I had maybe five, six times.
9      Q.  During what time period?
10     A.  For last so many years.
11     Q.  And how many times did you talk to the
12  DeKalb County Police Department about sex
13  trafficking?
14     A.  About the sex trafficking, I don't think I
15  ever talked to them.
16     Q.  So are you saying that the DeKalb County
17  Police Department would come talk to you about
18  prostitution after they had already been on the
19  property to arrest somebody relating to prostitution?
20     A.  The answer is yes, but those -- those --
21  some of those times, I call, or my front desk call,
22  or the -- my manager call to the police department,
23  tell them, look, we -- we think there is a, you know,
24  too much traffic going on, there is some suspicious
25  stuff going on.  So, we don't want to go to the room,

Page 111

1  but help us.  So they came and they tell us, look,
2  you know, we are telling you to, you know, remove
3  these people from here and we are going to arrest
4  them, or they may have the warrant.  So they take
5  them with them.  So sometimes we call them and they
6  take out the people.  And then, you know, they --
7  they did tell me, you know, like, look, you know,
8  this women doing prostitution and we -- we find out
9  this in our record, so we taking them off there.  Or
10  sometime they come in for their own, and they arrest
11  people and take them away.
12     Q.  After you had conversations with the
13  DeKalb County Police Department about prostitution,
14  did you ever say, you know, as the owner and manager
15  of this hotel, I need to consider what steps I can
16  take to try to prevent that from happening on this
17  property?
18     A.  Yes.
19     Q.  What steps did you take?
20     A.  No, I asked them what should I do.  And
21  they said look, you know, you need to call us, don't
22  try to, you know, involve with the commotion, don't
23  put yourself -- yourself in, you know, jeopardize
24  position, call us.
25     Q.  Did they say don't hire any more security

Page 112

1  guards?
2      A.  No, they -- they said, you know, you
3  should hire security guard.
4      Q.  They said that?
5      A.  Yeah, they said some, you know.
6      Q.  But you decided not to?
7      A.  Yeah, I did not do it so far.
8      Q.  Did the DeKalb County Police Department
9  ever notify you in writing that there was
10  prostitution on the property?
11     A.  No.
12     Q.  All of these communications that you're
13  describing were oral communications?
14     A.  Right.
15     Q.  Do you have any written correspondence of
16  any type with the DeKalb County Police Department?
17     A.  Correspondence meaning?
18     Q.  Meaning letters, e-mails, faxes.
19     A.  No.
20     Q.  Do you have an e-mail that you maintain
21  for the United Inn and Suites?
22     A.  Yes.
23     Q.  What is that e-mail address?
24     A.  It's called UnitedInn4649@gmail.com.
25     Q.  What do you use that e-mail address for?

Page 113

1      A.  I use it for sending e-mail to, you know,
2  like a -- some customer, you know.  If they need --
3  you know, sometimes they need to authorize me, you
4  know, that sometime they have -- and it's not
5  sometime, it's, you know, a few times.  The owner of
6  the credit card, you know, send me the information
7  because they are sending their conception group.  And
8  they send their information, they send the custom
9  group's information.
10         And that's -- I talk to some of customer,
11  you know.  If they have a complaint, they send me,
12  you know, we need service, you know, that day or we
13  need extra service.  So they communicate, you know,
14  once a while like that.
15     Q.  Do you use that e-mail address to send and
16  receive e-mails related to the business operations of
17  the hotel?
18     A.  Yes.
19     Q.  Did that e-mail address exist in 2017?
20     A.  Yes.
21     Q.  Was it in use at that time?
22     A.  I believe so.  Yes.
23     Q.  You said that the DeKalb County Police
24  Department recommended hiring security guards; they
25  said that you could call them, the DeKalb County

29 (Pages 110 - 113)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 114

1  Police Department, any time you saw a crime on the
2  property.
3      A.  Right.
4      Q.  Did they recommend that you take any other
5  steps on the property to try to reduce crime, reduce
6  prostitution?
7      A.  They recommended to me?  No, that's the --
8  pretty much, you know, like when they come in, we
9  have conversation, you know, that this thing can --
10 and this is their -- and their response is, look, you
11 know, this is, you know, the neighborhood we have,
12 you know, on the Memorial Drive, you know.  Crime
13 happen.
14     Q.  I'm going to show you what's been marked
15 as Plaintiff's Exhibit 8, which is Bates-stamped
16 Plaintiff 194 and 195.
17         (Exhibit No. 8 was marked for
18     identification.)
19     Q.  (By Mr. Bouchard) This is a police report,
20 Mr. Shareef, dated August 12th, 2015.  Do you see
21 that?
22     A.  Uh-huh.  Yes.
23     Q.  Have you seen this report before?
24     A.  No.
25     Q.  I'll represent to you -- you can see on

Page 115

1  the first page at the very top in the left, it says,
2  Incident type: Prostitution.  And I'll represent to
3  you on the narrative on page 2, that this report
4  documents that a woman was arrested for prostitution
5  at the hotel after meeting two undercover officers in
6  the parking lot, and then walking to Room 101 of the
7  hotel.  The woman didn't have a key to the room.  The
8  report says, she walked to the front desk to get one,
9  and then went back to Room 101 to have commercial sex
10 with these undercover officers, and they arrested
11 her.
12         Do you agree that there was prostitution
13 at the United Inn and Suites as of August 2015?
14     A.  Yeah, looking at this report, I agree.
15     Q.  I'm going to show you what's been marked
16 as Plaintiff's Exhibit 9.
17         (Exhibit No. 9 was marked for
18     identification.)
19     Q.  (By Mr. Bouchard) And this is
20 Bates-stamped Plaintiff 1379 to 1383.  Mr. Shareef,
21 this is a police report, Plaintiff's Exhibit 9 that
22 dated June 2nd, 2017.  Do you see that?
23     A.  Yes.
24     Q.  And I trust you have not seen this report
25 before, or have you seen it before?

Page 116

1      A.  No, I don't have any recollection.
2      Q.  And you can see in the top left, the
3  incident type is identified as simple assault,
4  interference with government property.  And I can
5  represent to you, sir, that if you go to page 1382,
6  which is really the fourth page of the document -- or
7  I'm sorry, page 1383, which is really the fifth page
8  of the document, that the assault involved a man
9  beating a woman in Room 345 at the hotel over monies
10 owed for sexual favors.
11         MR. STORY:  One more page.  It's on
12 the next page.  You're on 1383, David?
13         MR. BOUCHARD:  Yes, Will, I am.
14 Sorry, I jumped.
15         MR. STORY:  No, that okay.
16         THE WITNESS:  82?
17         MR. BOUCHARD:  I'm on 83.
18         MR. STORY:  Yeah, you're on the
19 right one.  Okay.
20     Q.  (By Mr. Bouchard) So this report says in
21 summary, Mr. Shareef, that a man was arrested after
22 beating a woman in Room 345 over monies owed for
23 sexual favors.  Do you agree that in June 2017, there
24 was prostitution on the property at United Inn and
25 Suites?

Page 117

1      A.  I mean, looking at this report, yes.
2      Q.  I'm showing you what's been marked as
3  Plaintiff's Exhibit 10, which is Bates-stamped 1398 to 1401.
4         (Exhibit No. 10 was marked for
5     identification.)
6      Q.  (By Mr. Bouchard) And this is a police
7  report, Mr. Shareef, dated June 20th, 2017.  Do you
8  see that?
9      A.  Yes.
10     Q.  And the incident type in the top left is
11 simple assault and then criminal trespass.  And if
12 you turn to the narrative section on page 1399, I'll
13 represent to you that the police here responded to a
14 fight between a prostitute and her pimp in Room 101
15 at the United Inn.  The pimp left this prostitute's
16 room after the fight to go stay at another woman's
17 room at the hotel.
18         Do you agree that as of June 20th, 2017,
19 there was prostitution at the United Inn and Suites?
20     A.  Yes, after looking at this report.
21     Q.  Showing you Plaintiff's Exhibit 13, which
22 is Bates-stamped Plaintiff 1432 to 1433 --
23         MR. STORY:  David, Plaintiff 11.
24         MR BOUCHARD:  Thanks, Will.  I'm
25 going to need that help, so don't hesitate

30 (Pages 114 - 117)

Page 118

1    to offer.
2        MR. STORY:  You gave it in mine, so
3    it's fine.
4        MR. BOUCHARD:  Yes.
5    Q.  (By Mr. Bouchard) Plaintiff's 11, this is
6    a police report dated July 21, 2017.  Do you see
7    that, Mr. Shareef?
8    A.  Yes.
9    Q.  And the incident type is prostitution; do
10   you see that?
11   A.  Yes.
12   Q.  And if you look at page 1433, it says in
13   the first paragraph, about halfway through the first
14   paragraph, "On July 20th, 2017, the DeKalb County
15   Vice Unit and the Federal Bureau of Investigation
16   Metro Atlanta Child Exploitation Task Force, with
17   help from the North Central Precinct Neighborhood
18   Enforcement Team, conducted an operation in reference
19   to a child and an adult prostitution at 4649
20   Memorial, United Inn and Suites, Decatur, Georgia.
21   Do you see that?
22   A.  Yes.
23   Q.  As of July 20th, 2017, do you agree that
24   prostitution was occurring at the United Inn and
25   Suites?

Page 119

1    A.  Yeah, after see this report, yes.
2    Q.  So you're saying that at the time, you
3    didn't know about any of this prostitution going
4    on --
5    A.  No.
6    Q.  -- that we just talked about?
7    A.  No.
8    Q.  Is that correct, you did not know what
9    --
10   A.  I did not.
11   Q.  -- you said?
12   A.  Yes.
13   Q.  So I'm going to go back to this deposition
14   that I was telling you about from the DeKalb County
15   Police Department officer.  And I want to read you
16   some other portions of it and get your reactions to
17   it.
18        So I asked him about that August 12th,
19   2015, report, which was the first police report we
20   just looked at, Plaintiff's Exhibit 8.  And you'll
21   see one of the officers' names on that report is
22   Officer Schofield.  And I asked -- I'm now quoting
23   from the deposition transcript.  Question: How was it
24   that you and Schofield ended up investigating this
25   prostitution at the United Inn as of August 12th,

Page 120

1    2015?  Answer: United Inn is/was one of the -- one of
2    the problem hotels that we had in the DeKalb County
3    for drug and prostitution anyway, so it was like a
4    radar hotel that we knew about due to the fact that a
5    lot of arrests were made, several arrests were made
6    for narcotics and prostitution prior, for several
7    years at the hotel.  And any time that we got a
8    female that we located off of Backpage.com and they
9    gave us that address number, we immediately know the
10   hotel, that it was United Inn.
11        Do you understand what I just read to you?
12   A.  Yes.
13   Q.  Does that surprise you?
14   A.  Yes.
15   Q.  Because you, as of August 12th, 2015, did
16   not understand that prostitution was commonly
17   occurring at the United Inn and Suites?
18   A.  Yes.
19   Q.  And prior to today, at no point in time,
20   you're testifying, did you believe that United Inn
21   and Suites had a problem with prostitution; is that
22   correct?
23   A.  Yeah.  After seeing these reports, yes.
24   Q.  So prior today, you never, at any point in
25   time, believed that prostitution was a problem at the

Page 121

1    hotel?
2    A.  No.  We call the cop many times, you know,
3    when -- in last, you know, 20 years, 18 years, you
4    know, that there's a -- there people that is coming
5    -- too many people going to the room, so there must
6    be something wrong, so we need some help.  And they
7    came and they, you know, removed the people and they
8    tell us, yes, that's a -- I mean, the woman is doing
9    prostitution, so we going to take her out.
10   Q.  And who would be the one who would observe
11   traffic to the room?  I mean, I assume if you --
12   A.  We have --
13   Q.  -- if you're working behind the front
14   desk, would you see traffic going to a room, or would
15   it be another hotel staff member who could see that?
16   A.  It's combination of both.  We see in the
17   cameras, or the other hotel staff, they came at the
18   front desk and tell us, you know, this room, you
19   know, we have so many people coming in and out, you
20   know.  So that's how we, you know, get some help from
21   the DeKalb County police.
22   Q.  So I wanted to read another portion to
23   you, sir, from this police officer's deposition from
24   DeKalb County.
25        Question: Is it fair to say that there

Page 122

1  were a number of women, in your experience, working
2  at the United Inn doing commercial sex activities?
3  Answer: Yes. Question: And was that true during the
4  entire time period that you were a member of the vice
5  unit from 2015 to 2021? Answer: Yes.
6      That -- that answer surprises you?
7      A.  Yes.
8      Q.  I asked him, Question: Are you familiar --
9  over the course of your time in law enforcement with
10 your work at the United Inn and Suites, are you
11 familiar with there being pimps at the hotel who were
12 working with prostitutes at the hotel?  Answer: Yes.
13 Question: Were you familiar with there being pimps at
14 the United Inn and Suites who were overseeing
15 multiple prostitutes at the same time?  Answer: Yes.
16 Question: Is the period of 2015 to 2021 when you were
17 familiar with there being pimps at the United Inn
18 overseeing multiple prostitutes?  Answer: Yes.
19     That answer, again, surprises you, I take
20 it, Mr. Shareef?
21     A.  That's right.
22     Q.  Because you had no knowledge of there
23 being pimps overseeing multiple prostitutes at the
24 hotel; is that correct?
25     A.  I have no knowledge, yes.

Page 123

1      Q.  So from 2017 to 2019, you had no knowledge
2  of there being multiple pimps at the hotel overseeing
3  multiple prostitutes at the hotel?
4          MR. STORY:  Objection.  You can
5      answer.
6          THE WITNESS:  I don't know how to
7      answer it.
8      Q.  (By Mr. Bouchard) Are you familiar with
9  the website Backpage?
10     A.  No.
11     Q.  You have no knowledge of the website
12 Backpage?
13     A.  No.
14     Q.  Did you know that there are websites on
15 the Internet that exist for the purposes of
16 advertisements for commercial sex activities?
17     A.  I don't know, but there must be a bunch of
18 them.  I don't know.
19     Q.  Well, do you know that or do you not know
20 that, that there are websites that exist for purposes
21 of advertising commercial sex?
22     A.  No, I believe there may be so many, but,
23 you know, I -- I don't know the specific, you know --
24 I never been to, you know, all these website and see
25 what's going on.

Page 124

1      Q.  Well, as a hotel owner and manager, did
2  you ever participate in any trainings or receive any
3  materials educating you about the popularity of
4  websites being used to advertise commercial sex at
5  hotels like the United Inn and Suites?
6      A.  I did not participate any, but other than
7  that, I -- I don't know.
8      Q.  So I'm going to read to you, again, a
9  portion of question and answer I had with this police
10 officer.
11         Question: When you were working with the
12 vice unit, you said that you would go on websites
13 like Backpage and ListCrawler, correct?  Answer: Yes.
14 Question: And when you went on those websites, did
15 you occasionally see advertisements for women who you
16 believed to be under the age of 18, that is, minors?
17 Answer: Yes.  Question: Do you believe that some of
18 those women worked in commercial sex activity at the
19 United Inn and Suites?  Answer: Yes.
20     Does that surprise you?
21     A.  Yes, surprise me.
22     Q.  I also asked him, Question: Do you know if
23 you can filter on Backpage to identify advertisements
24 in a certain area, and if that was only available to
25 you as a police officer or if that was available to

Page 125

1  everyone in the general public using that website.
2  Answer: Everyone in the general public can type it
3  in.  If you know how to navigate through the
4  Backpage.com at the time, you could utilize it.
5      Did you know that?
6      A.  No.
7      Q.  Did you know that this police officer
8  testified that when he would filter on Backpage.com
9  for commercial sex advertisements around Memorial
10 Drive, nine out of ten of the posts would be coming
11 from United Inn and Suites?
12         MR. STORY:  Object to the form.
13         THE WITNESS:  So what is your
14     question then?
15     Q.  (By Mr. Bouchard) Did you know that he
16 testified to that?
17     A.  You're telling me he testified that.
18     Q.  I am telling you he testified --
19     A.  Yes.
20     Q.  -- to that.
21     A.  But I did not know after.
22     Q.  Did you know that Backpage had a filter
23 that you could use to try to locate where
24 advertisements were coming from?
25     A.  No.

32 (Pages 122 - 125)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 134

1    VIDEOGRAPHER: Back on the record at
2    12:20.
3    Q.  (By Mr. Bouchard) Mr. Shareef, I can
4    represent to you that as part of the discovery
5    process in this case, Northbrook Industries has
6    answered questions that we provided to them about
7    various issues in the case. Okay? And one of the
8    issues that we asked about was who monitors online
9    reviews at the hotel. And the response provided was
10   that you and Mr. Islam monitor reviews. Is that
11   correct?
12   A.  Yes.
13   Q.  Did somebody ask you to monitor online
14   reviews at the hotel, or did you take it upon
15   yourself to do that?
16   A.  Took it upon ourself, yeah.
17   Q.  Which websites would you monitor reviews
18   from?
19   A.  On the Google.
20   Q.  Any other websites?
21   A.  No.
22   Q.  Like Expedia on Priceline, Orbitz?
23   A.  No, we don't do that.
24   Q.  Just Google?
25   A.  Yeah.

Page 135

1    Q.  How did you decide to just do Google?
2    A.  I think it would come automatically to
3    you, so that's what happened.
4    Q.  Why did you look at online reviews?
5    A.  To see, you know, what's going on, and if
6    there is something that we can do to fix it. That's
7    the reason.
8    Q.  To try to get feedback from the customers?
9    A.  Yeah.
10   Q.  I want to show you Plaintiff's Exhibit 12,
11   which is a Google -- some Google reviews.
12       (Exhibit No. 12 was marked for
13       identification.)
14   Q.  (By Mr. Bouchard) And do you see
15   Plaintiff's Exhibit 12, Mr. Shareef --
16   A.  Yes.
17   Q.  -- there's four reviews called out here on
18   the bottom half of the Document. One says, Full of
19   mess, drugs. Another one from Angela Monroe Wood
20   says, They cook drugs here. It's a no for me, dog.
21   Been coming here -- around here for nine months to
22   visit family who stay here, and this is horrific.
23   And then the last review says, Full of drug dealers
24   and addicts, had roaches there, costs too much a
25   week.

Page 136

1    Do you see that?
2    A.  Yes.
3    Q.  Did you see these reviews prior to today?
4    A.  I had said -- I don't know about these
5    reviews, but the -- if these guests are -- if these
6    people are in our guest list, so we, you know, find
7    out and, you know, find the number from the -- from
8    our -- the check-in system from the record, and call
9    them and ask them that, you know, they gave us, you
10   know, this -- like a full of drugs. So what did the
11   -- what did they find out? So, it's like maybe, you
12   know, if I call them, they say, oh, you know what,
13   somebody knock my door and try to sell drug, and I
14   didn't like it. So we'll apologize that and, you
15   know, just to see if there is something that we can
16   fix it.
17       Sometimes they give us review that they
18   are -- they are there living there, and we fix their
19   problem right away.
20   Q.  So I noticed that, for example, in
21   Plaintiff's Exhibit 12, there's no written response
22   here from the hotel --
23   A.  Uh-huh.
24   Q.  -- to the review.
25   A.  Right.

Page 137

1    Q.  Right? Was it your practice to not write
2    a response on Google?
3    A.  Yes.
4    Q.  Are you saying that you would call people
5    --
6    A.  Call, yes.
7    Q.  -- who left negative reviews?
8    A.  Yes.
9    Q.  And you would --
10       MR. STORY: Try to let him get his
11   question out.
12       THE WITNESS: Oh, I'm sorry.
13       MR. STORY: You're good. Try again
14   --
15   Q.  (By Mr Bouchard) So, are you saying you
16   would do that every time?
17   A.  No.
18   Q.  Sometimes?
19   A.  Yes.
20   Q.  Who would actually make the phone call,
21   Mr. Shareef? Would you personally?
22   A.  I did.
23   Q.  To try to address whatever it was that
24   caused the negative review?
25   A.  Yes.

35 (Pages 134 - 137)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 150

1  looks like a regular car, but he has those lights on.
2  So it looks like a private car sometimes.
3      Q.   And remember, I'm talking about 2017 to
4  2019?
5      A.   Yeah, at that time, also.
6      Q.   Okay.
7      A.   Same thing.
8      Q.   Same thing then?
9      A.   Yeah.
10     Q.   So, you've told me that when you were at
11 the property for 15 to 25 days a month, you would
12 typically be sleeping from around 10 or 11 until 6, 7
13 or 8 in the morning.  So how would you know what
14 Webber and McClelland did when they were on their
15 shifts?
16     A.   They -- I mean, we communicate via kind of
17 text message, phone call.  And they come on a very
18 regular basis on the daytime.  But again, many, many
19 nights, I'm up, you know.  Like yesterday, I talked
20 with the officer at almost 1 a.m.  And he was outside
21 and we have, you know, some conversation.  So
22 sometimes I see them, you know, sitting at the car or
23 walking around, so we talk.
24     Q.   So if you are awake, you might see them,
25 but if you are not awake, you're sleeping; you

Page 151

1  obviously don't know what they were doing or not
2  doing?
3      A.   Yeah, that's right.
4      Q.   You're saying you would have text messages
5  between yourself and Officers Webber or McClelland?
6      A.   Yeah.  We text each other.  Yeah...
7      Q.   So when their shift ended at 2 a.m., if
8  I'm understanding correctly, most -- most nights, you
9  would be asleep, then.  So would they write up a
10 report, or how would you learn what had transpired
11 during their shift?
12     A.   When they leave, they inform the front
13 desk, you know, if something happened, or, you know
14 the front desk talk with them or they tell me, you
15 know, in the morning.  Or maybe the officer next
16 morning, they tell me, hey, you know, I have two
17 room, you know, they are, you know, making noise or
18 they are -- you know, they standing outside or loud
19 music.  And we put them in the room.  So next day, I
20 can find out what's going on.
21     Q.   So it was word of mouth?
22     A.   Yeah.
23     Q.   They wouldn't draft an actual document --
24     A.   No, we don't.
25     Q.   -- report?

Page 152

1      A.   We don't.
2      Q.   So they would -- before they left at
3  2 a.m., they would make an oral report to the person
4  working at the front desk telling them what --
5      A.   Not necessarily.
6      Q.   Okay.
7      A.   Not necessarily.
8      Q.   Only if there was something that they
9  thought they needed to report?
10     A.   Yes.
11     Q.   And if there was something they thought
12 they needed to report and they did report it, then
13 the front desk would convey that to you when you
14 started working in the morning?
15     A.   That's right.
16     Q.   Did you ever e-mail with Webber or
17 McClelland, or just text message?
18     A.   Some was text message all that.
19     Q.   I think you've suggested -- and maybe --
20 correct me if I'm wrong.  I understood you to suggest
21 that you decided to have security from 10 p.m. to
22 2 a.m. because that was the period of the 24-hour day
23 when there was the most activity on the property that
24 might be criminal in nature.
25     A.   Yes.

Page 153

1      MS. WARD:  Objection.
2      THE WITNESS:  Yeah.
3      Q.   (By Mr. Bouchard) Outside of that time
4  period, you agree that there could still be criminal
5  activity of course, right?
6      A.   Yeah, could be.
7      Q.   Just because the security guard leaves at
8  2, doesn't mean there couldn't be crime at 2:15?
9      A.   Uh-huh.
10     Q.   Is that a yes?
11     A.   Yes.
12     Q.   And from 2017 to 2019, you never had a
13 security company that you contracted with to provide
14 security at the hotel; it was just Officers Webber
15 and McClelland; is that right?
16     A.   Right.
17     Q.   Did you ever, at any point in time, sir,
18 have a security assessment done of the property?
19     A.   Security assessment.  No.
20     Q.   Have you ever hired anybody to do an audit
21 of the property to try to determine what could be
22 done to enhance security?
23     A.   No.
24     Q.   Did the security guards, Webber and
25 McClelland, from the years 2017 to 2019, ever make

39 (Pages 150 - 153)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 154

1  recommendations on what you could do to improve
2  security at the hotel?
3      A.  Yes.  We talk about it and they -- they're
4  not objecting it.
5      Q.  What suggestions did they have on how you
6  could improve security at the hotel?
7      A.  When this security person -- hiring a
8  security person coming or security company come up, I
9  ask them if they recommend, you know, some company
10  who is good that can do the job.  And they said, you
11  know, the -- there are so many, I have to look.  But
12  they never recommend anybody, but they, you know --
13  the suggestion is there.
14      Q.  Why didn't you look yourself?
15      A.  In sometime of 2007, '8 and '9, I did hire
16  a security company, but I find out they -- they did
17  not turn out to be good.
18      Q.  I think I've asked you this question a few
19  different ways.  What is the reason why you did not
20  have any security at the hotel outside of 10 p.m. to
21  2 a.m.?
22      MS. WARD:  Objection.
23      THE WITNESS:  I don't know how to
24      answer it.
25      Q.  (By Mr. Bouchard) Well, you're the manager

Page 155

1  and the owner.
2      A.  Yes.
3      Q.  So, I mean, if this case goes to trial
4  and, for example, Mr. Shareef, you provide testimony
5  at trial, well, the reason why I didn't do that was
6  X, Y, Z, this is my only opportunity to find out why
7  the owner and the manager at the United Inn and
8  Suites didn't hire security guards for the other
9  20 hours of the day.  So what -- is the reason I
10  don't know why, or is there a reason why you did not?
11      A.  No, the only reason is I have, you know,
12  the -- the DeKalb County, I call them and they come
13  and, you know.  I do whatever I need to make a call,
14  so if there is somebody need to be removed the
15  property, they come and do it for me, or some other,
16  you know, things.  So, basically DeKalb County, yeah,
17  I call them and ask for help.  That's the -- that
18  could be the reason.
19      Q.  I think you mentioned that DeKalb County
20  police had recommended to you that you hire more
21  security?
22      A.  Yeah, they suggest it, yes.
23      Q.  When was that?  Was that around 2017 to
24  2019?
25      A.  I don't recall when was that.

Page 156

1      Q.  Do you recall if Webber or McClelland ever
2  suggested hiring more security?
3      A.  No, not really.
4      Q.  You do not recall?
5      A.  No.
6      Q.  Did you ever have any complaints about
7  Webber or McClelland and the services they were
8  providing?
9      A.  Complaint about those officers?
10      Q.  Uh-huh.
11      A.  No.
12      Q.  You were pleased with the work they were
13  doing?
14      A.  Yes.
15      Q.  Was there a curfew from 27 [sic] to 2019
16  at the United Inn and Suites?
17      A.  Curfew mean -- what does that mean,
18  curfew?
19      Q.  People are not allowed to be outside of
20  their rooms.
21      A.  Not the curfew.  We enforce it, they're
22  not allowing to standing long time there.  But
23  there's not a curfew thing.
24      Q.  How would the cur- --- how would the rule
25  on loitering be enforced after 2:00 in the morning

Page 157

1  before the morning shift shows up, because there's
2  only one person working at the hotel?
3      A.  The -- the front desk who is there, they
4  go out and make a round.  And when they see someone
5  standing there or maybe the -- you know, the -- we
6  got a -- you know, like we get complaint like
7  somebody from a certain room call, hey, there are
8  people standing and they have, you know, very loud,
9  and I cannot sleep, so they making noise or they
10  listen to music.  So the front desk go there and tell
11  them to, you know, go in their room and sleep.
12      Q.  Where are the surveillance cameras
13  located?
14      A.  That is at the front desk.
15      Q.  The feed where you could actually see what
16  the surveillance cameras are showing are at the front
17  desk?
18      A.  Yes.
19      Q.  Are they also behind the window?
20      A.  No.
21      Q.  So, you've said that at nighttime, the
22  front desk area is closed, the window is open.
23      A.  Yes.
24      Q.  Is the person -- the one person who's
25  working at the hotel behind the window at nighttime,

40 (Pages 154 - 157)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 158

1  do they have access to surveillance camera feeds?
2      A.  Yes.
3      Q.  Because there are -- there's a feed behind
4  the window?  Is there a screen --
5      A.  No, there's --
6      Q.  -- a video screen they can look at --
7      A.  Yeah, yeah.
8      Q.  -- behind the window?
9      A.  Yeah.  We have monitor right there, so
10 they are standing here, you know.  So then let's say
11 this is a window, and monitor is right here in this
12 wall.
13     Q.  And how many cameras are there throughout
14 the hotel property?
15     A.  I believe 36.
16     Q.  How many rooms are in the hotel?
17     A.  172.
18     Q.  172?
19     A.  Yes.
20     Q.  And what's max capacity at the hotel in
21 terms of guests?
22     A.  Max capacity.  I mean, I have maybe 10, 20
23 rooms empty, you know, in the average day.  Is that
24 the question?
25     Q.  Well, that it -- that's the answer to a

Page 159

1  different question I was going to ask.
2      A.  Okay.
3      Q.  So, on average, would you be renting out
4  about 150 rooms a night?
5      A.  Yes.
6      Q.  And so if you have one or two or more
7  guests, you may have 150 to 300 people staying at the
8  hotel?
9      A.  Yes.
10     Q.  Or more, if there are more quests in a
11 room, correct --
12     A.  Right.  Yes.
13     Q.  What's the max number of guests that
14 should be in a room?
15     A.  Two adults, and two children.
16     Q.  So four?
17     A.  Yes.
18     Q.  Who was responsible for reviewing the
19 surveillance camera footage?  Is it whoever was
20 working at the front desk at that point in time?
21     A.  Yes.
22     Q.  And if they saw something concerning, what
23 were they supposed to do?
24     A.  They go out and, you know, tell the --
25 whoever is doing something, people are just, you

Page 160

1  know, hanging there, loud conversation, or the
2  smoking, they tell them, hey, man, there is no
3  smoking policy in the DeKalb County hotel.  So you
4  cannot smoke.  And then they tell them to go stay in
5  the room.
6      Q.  So they would go out and talk to the
7  guests about whatever it is they'd seen that was
8  concerning?
9      A.  Yes.  Yes.
10     Q.  You've referenced a do-not-rent list.  Is
11 that actually like a document with a list of people's
12 names on it?
13     A.  Yes.
14     Q.  Okay.
15     A.  Big one.
16     Q.  Do you maintain that document?
17     A.  Big one, yes.
18     Q.  I don't know if it's been produced in
19 discovery.  So it's something you have at the hotel?
20     A.  That is -- I don't know how to produce
21 that, but this is like -- can I give example, so this
22 way maybe I explain better?
23         So a person rent a room two years ago, or
24 yesterday, and they misbehave for anything.  We put
25 them on a do-not-rent list.  So when they come back,

Page 161

1  the system already give a red flag, so they cannot
2  get a room at my place.
3      Q.  So, their name would somehow be entered
4  into their reservation system and it -- there would
5  be a flag --
6      A.  Something like that.
7      Q.  -- if that person came back?
8      A.  Yes.
9      Q.  So it's not like you can go back to the
10 office and pull up, like here's my do-not-rent list,
11 it's not a paper document that you have.  Is that
12 what you're saying?
13     A.  I -- I never print it.
14     Q.  Okay.
15     A.  I -- I don't know how to print it.
16     Q.  Okay.
17     A.  But the system make it so easy, so in like
18 a five second, we found out this guy stays in 20 --
19 you know, '15 or '16, do not rent him a room.
20     Q.  Let me ask you about your reser- -- room
21 reservation system.  So, how -- I want to ask about
22 searching your room reservation system.
23     A.  Okay.
24     Q.  Are you able to search your room
25 reservation system for guests for a particular time

41 (Pages 158 - 161)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 182

1  document, but you think the first two were signed by
2  Azfar?
3      A.  No, I don't say it's signed by Azfar.  I
4  don't know.  I said somebody in the office.
5      Q.  You don't know who signed any of these?
6      A.  Right.
7      Q.  You presume it was somebody who works for
8  Bulldog Insurance; is that correct?
9      A.  Yes.
10     Q.  Is that your insurance broker?
11     A.  Yes.
12         THE WITNESS:  I need to go to the
13  bathroom.
14         MR. STORY:  Yeah, let's take a
15  break.
16         MR. BOUCHARD:  Take a break.
17         MS. WARD:  And the food is here.
18         VIDEOGRAPHER:  Off the record 1:22.
19         (Recess was taken.)
20         VIDEOGRAPHER:  Back on the record at
21  2:01.
22     Q.  (By Mr. Bouchard) Mr. Shareef, welcome
23  back.  Did you have a chance to have some lunch?
24     A.  Yes, yes.  Thank you.
25     Q.  Very good.  I want to move on now and talk

Page 183

1  to you a little bit more, Mr. Shareef, about training
2  at the hotel.
3      A.  Okay.
4      Q.  If I've understood your testimony today
5  correctly, it sounds like there were not formal
6  scheduled training sessions with the entire staff all
7  gathering together at one time, but instead there
8  were kind of more casual informal discussions between
9  you or Mr. Islam and individual staff members.  Is
10  that correct?
11     A.  Yes.
12     Q.  So let me -- just to make sure I've got
13  that, let me just ask you: From 2017 to 2019, were
14  there ever training sessions provided at the hotel
15  for all of the staff at the hotel at the same time?
16     A.  No.
17     Q.  Would you train staff at the hotel by
18  talking with them one on one?
19     A.  Yes.
20     Q.  Is that how Mr. Islam would have trained
21  staff at the hotel as well?
22     A.  Yes.
23     Q.  Do you believe that all of the staff who
24  worked at the hotel from 2017 through 2019 received
25  training at some point?

Page 184

1      A.  Yes.
2      Q.  Did that training include signs of
3  criminal activity, including prostitution?
4      A.  Yes.
5      Q.  In other words, would you cover, as part
6  of the training that you would provide to staff,
7  things to look out for that might indicate criminal
8  activity?
9      A.  Yes.
10     Q.  And what types of things would you say to
11  staff when you were training them about what might
12  indicate criminal activity?
13     A.  So, we -- like our observation was that if
14  we have seen evidence of too many people going -- you
15  know any particular room, and they keep going back
16  and forth, or the people are just standing in front
17  -- front of the room, and they are, you know, talking
18  loud, they are smoking, or, you know, they start,
19  yelling at each other, fighting, so all these signs
20  are that, you know, you need to be very careful and
21  try to resolve it, you know.  And tell people that
22  they just go back to their room and stay in their
23  room, or they leave.  So, either case, if they go
24  back to their room and calm down, that's fine.  If
25  they refuse to do it, then we call the DeKalb County

Page 185

1  and seek for their help.  And when they come in,
2  they, you know, kind of observe that -- what is going
3  on.  Sometime they find out the person who is
4  involved in any type of commotion, you know, they
5  have some kind of warning or the warrant against
6  them, so they take them away.  Or sometime we tell
7  them to -- you know, we don't want this person here
8  anymore, remove them from the property.  So they
9  remove it, and we get the trespass warning against
10  them so they never come back.
11         So those are the things we talk to our
12  staff, and they observe it very carefully.
13     Q.  Are there any other things that you would
14  tell your staff to look out for as it relates to
15  trying to identify criminal activity?  You just gave
16  me a list of items.  I'm wondering is there anything
17  else or did you just tell me everything.
18     A.  The -- most of the time is that we just
19  cannot -- I don't go in the room for, you know -- if
20  we think there is something going on -- into the
21  room.  So we call the, you know, police and tell
22  them, you know, that, look, we need help to find out,
23  you know, why these people have so -- so much traffic
24  going to the room.  And they don't listen to us, so
25  they need to be removed from the property.

47 (Pages 182 - 185)

CONF Tahir Shareef                     February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 186

1    Q.   Did all of the housekeepers speak English
2  from 2017 to 2019?
3    A.   Some speaks little bit better, but some,
4  they don't.
5    Q.   And so, if -- I'm assuming would they
6  speak -- based on the names, would they speak
7  Spanish?
8    A.   They did speak Spanish.
9    Q.   Did some of the housekeepers from 2017 to
10 2019 not speak English at all?
11   A.   No.  Everybody speak English.
12   Q.   Did some of the housekeepers speak very
13 limited English?
14   A.   Uh-huh.
15   Q.   And would -- when you say you would train
16 staff at the hotel through one-on-one discussions,
17 either involving you or Mr. Islam, would you talk in
18 Spanish to somebody who speaks very limited English?
19   A.   No.  We have three housekeeper they speak
20 fairly well.  So they involve them stay with us, and
21 then they translated.
22   Q.   How often would you have these discussions
23 about what to look for as it relates to criminal
24 activity on the property?  Was this the kind of
25 thing, Mr. Shareef, where when you hired somebody and

Page 187

1  you were introducing them to the property and they
2  were beginning their work at the property, that you
3  would talk to them about criminal activity and what
4  to look for?  Or is it something that you continued
5  to talk to hotel staff about on an ongoing basis?
6    A.   Of course whenever we hire any new person,
7  that is part of their, you know, detail, work ethics,
8  you know, what to do, besides how to do their job.
9  So we tell them all the -- all the thing which I
10 already explained to you.  And then at least we go,
11 maybe -- if not a monthly basis, maybe bi-monthly
12 basis, we talk to them and just refresh the memory.
13   Q.   Were there ever training materials
14 distributed in writing, or were all of the trainings
15 oral?
16   A.   No.
17   Q.   All of the trainings were oral?
18   A.   Just oral, yes.
19   Q.   So there's no written training materials?
20   A.   No.
21   Q.   And that rhythm or schedule that you just
22 described of, I'd train people when they started
23 working at the hotel, and then maybe on a monthly or
24 every two months basis have a conversation with them,
25 was that true from 2017 to 2019?

Page 188

1    A.   Yes.
2    Q.   Did you, at any point in time,
3  specifically provide a training or discussion
4  focusing on prostitution or sex trafficking or sex
5  for money?
6    A.   Yes, we talk about it.  And we did tell
7  them that, you know, everybody need to have their,
8  you know, eyes keep it open and see what happened.
9  And then the -- the sex trafficking or the
10 prostitution, we just cannot, you know, go and don't
11 know how to, you know, go for no reason in the room
12 and tell them what you're doing is prostitution and
13 sex trafficking.  So in that case, you know, we
14 always seek help from the DeKalb County Police.
15   Q.   Of course, I assume, and correct me if I'm
16 wrong, the housekeepers at United Inn and Suites
17 would regularly go into hotel rooms to clean --
18   A.   Yes.
19   Q.   -- right?
20   A.   To clean, yes.
21   Q.   And if there were any evidence of
22 commercial sex activities occurring outside of the
23 room, either in the stairwells, in the hallways, in
24 the parking lots, that is visible to staff at the
25 hotel, right?

Page 189

1    A.   Right.
2    Q.   Because it's not in a hotel room?
3    A.   Uh-huh.
4    Q.   Is that correct?
5    A.   That's right.
6    Q.   Mr. Shareef, you gave me -- as I said and
7  as you've said, you gave me a list of things that you
8  told staff to look for that would indicate criminal
9  activity.  When you talk to staff about prostitution
10 or sex for money at the hotel and things to look for,
11 did you give them any additional items to look for,
12 or is it similar to the items that you already
13 described?
14   A.   Basically similar from the item.
15   Q.   Where would these conversations occur when
16 you would train, provide these trainings to staff
17 members?  Where would you be?
18   A.   Next to the front desk, we have just a --
19 we call it back office.  So, with the -- with the
20 front desk staff, we kind of sit there in the back
21 office and have some conversation.  And for the
22 housekeeping, they have their lunchroom, we can call.
23 So the sitting area.  So -- but, you know, about
24 eight chairs there, sometimes they have for -- you
25 know, get together for the lunchtime, or sometime

48 (Pages 186 - 189)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

---

Page 190

1  when they are finish the day work, and before they
2  clock out, so we talk about it.
3      Q.  And is there a clock-in, clock-out system?
4      A.  Clock-in, clock-out system, yes.
5      Q.  Where is that system?
6      A.  That is in the main office.
7      Q.  Which is by the lobby and the front desk?
8      A.  Yes.
9      Q.  Do -- is it a punch card system or how
10  does -- how --
11      A.  Yes, punch card.
12      Q.  Punch card.  Was that true in 2017 to
13  2019?
14      A.  Yeah.
15      Q.  Is there an electronic record of --
16      A.  No.
17      Q.  No?  Okay.  The information that you would
18  provide in the trainings, Mr. Shareef, what you've
19  described to me, where did you get that information
20  from?
21      A.  This is -- we have, like this observation
22  for last, you know, 17 years, and then we have, you
23  know, something, you know, come up at the -- help
24  with the police officer, you know.  So -- but the
25  basic -- but the basic thing which I emphasize to

Page 191

1  them, that do not enforce anything, you know, call --
2  tell the front desk, tell us.  Just identify the
3  room, all the people, and then we take care of the
4  rest of the thing.
5      Q.  So are you saying the information that you
6  relied upon to provide these trainings to the hotel
7  staff, was that information based on your
8  observations of the property over 17 years?
9      A.  Yeah.
10      Q.  As opposed to saying, no, it was based on
11  this manual that I had from AAHOA, or this manual I
12  got from the American Hospitality and Lodging
13  Association, so was there any training material like
14  that, like a document that you were relying on, or
15  was it your observations of the property?
16      A.  Yeah, but those -- yeah, those document
17  which I read, you know, that time.  So those are
18  basically some common sense.  But, you know, that is
19  maybe a -- like a few papers, you know, in the office
20  file.  But we kind of never provide them any written
21  -- like a material.
22      Q.  And you believe, as you've said, that
23  everybody who would have worked at the property from
24  2017 to '19, would have been trained in the way
25  you've described?

Page 192

1      A.  Yeah.
2      Q.  Do you believe everybody who worked at the
3  hotel in that time period would verify that if they
4  were asked that question?
5      A.  Yeah.
6      Q.  Other than you and Mr. Islam, was anybody
7  else responsible for providing training of hotel
8  staff?
9      A.  No.
10      Q.  In the years 2017 to 2019, nobody else --
11      A.  Nobody else.
12      Q.  -- was responsible?
13      A.  Yeah.
14      Q.  Would you and Mr. Islam, you know, prepare
15  together in terms of what you were going to tell
16  staff about what to look for?  Would you discuss
17  together?
18      A.  We discuss together, yes.  Not -- I don't
19  want to -- but bear -- we discuss together, and then
20  we can, you know, address for if we have, you know,
21  something we call the cops, you know, on -- on
22  someone, on some of the rooms.  So we kind of mention
23  that, hey, you know, this front desk person or the
24  housekeeper mentioned something.  And on their
25  observation, we remove that person from the property.

Page 193

1  And we need to tell the other people to, you know, do
2  the same.
3      Q.  Did you ever ask any outside organizations
4  to provide a training to the hotel staff?
5      A.  No.
6      Q.  On any topic related to crime or any other
7  topic, you did not?
8      A.  No.
9      Q.  Did you post any flyers at the hotel about
10  human trafficking?
11      A.  I don't know.  I don't think so, but I --
12  I can -- I can picture it, I have something, but it's
13  -- it's buried, you know, under the other paperwork
14  on the -- on the wall I'm talking about.
15      Q.  Is this a wall in the lobby or where are
16  you thinking of --
17      A.  Yeah.
18      Q.  In the lobby?
19      A.  Yeah.
20      Q.  I want to look back at Plaintiff's
21  Exhibit 2, which is this Blue Campaign document,
22  Mr. Shareef.
23      A.  Uh-huh.
24      Q.  Do you remember talking very briefly about
25  this --

49 (Pages 190 - 193)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 210

1     Q.   Okay.
2     A.   There's a few wholesaler in DeKalb County,
3   we get from there.
4     Q.   Do you have guests at the hotel who have
5   traveled across state lines to come stay at the
6   property?  In other words, guests from out of state.
7     A.   Lots of them, yes.
8     Q.   And you accept credit cards at the hotel?
9     A.   Yes.
10         MR. BOUCHARD:  Are we on 18?
11         MR. STORY:  I think we're on 17, but
12   if --
13         MS. WARD:  We've already had 17.
14         MR. BOUCHARD:  Yes.
15         MS. WARD:  18 will be next.
16         MR. STORY:  Okay.  Okay.
17         MR. BOUCHARD:  18 was the -- 17 was
18   the insurance application.
19         MS. WARD:  Yes.
20         MR. STORY:  Yes.  Got you.
21         MR. BOUCHARD:  All right.
22         (Exhibit No. 18 was marked for
23   identification.)
24     Q.   (By Mr. Bouchard) Showing you what's been
25   marked as Plaintiff's Exhibit 18.  I can represent to

Page 211

1   you that this is a picture of J.G. taken when she was
2   16 years old, which is how old she was when she was
3   sex trafficked at the United Inn and Suites.  Do you
4   recognize Ms. J.D.?
5     A.   No.
6     Q.   You don't believe you've ever seen her
7   before?
8     A.   No.
9     Q.   And if she said she recognized you and had
10   seen you before, would you say it's possible you
11   don't remember seeing her, or you are certain you
12   have never seen her before?
13     A.   If she said she saw me, maybe, because I
14   have, you know, more than 300 people at any given
15   time.  So, I may not be -- remember all the faces.
16         (Exhibit No. 19 was marked for
17   identification.)
18     Q.   (By Mr. Bouchard) I'm sending -- sorry,
19   excuse me.  Showing you a photo what I've marked as
20   Plaintiff's Exhibit 19, which is, I'll represent to
21   you, a photo of A.G., G.W. and a sex buyer at the
22   United Inn and Suites in 2017.  Do you recognize, in
23   Plaintiff's Exhibit 19 --
24     A.   No.
25     Q.   -- either of the women photographed there?

Page 212

1     A.   No.
2     Q.   You don't think you've seen them before?
3     A.   No.
4     Q.   Again, if they said that they recognized
5   you, would you say I've definitely never seen them
6   before, or would you just say, I may have, but I
7   don't remember because I see a lot of guests?
8     A.   I think I -- I don't recall.  I'm not
9   remember them.
10     Q.   Showing you a photo that's been marked as
11   Plaintiff's Exhibit 20.
12         (Exhibit No. 20 was marked for
13   identification.)
14     Q.   (By Mr. Bouchard) I'll represent to you
15   this is a photo of G.W.  Is this, from what you can
16   tell, Mr. Shareef, a photo of a room at the United
17   Inn and Suites?
18     A.   I don't know if these two lines represent
19   what here.  So, I don't -- I don't recall these two
20   lines there.  What is this?
21         MR. STORY:  I think that's a mirror.
22         MR. BOUCHARD:  A mirror.
23         THE WITNESS:  Oh, that's a mirror.
24   Okay.
25         MR. STORY:  It's harder because it's

Page 213

1   in black and white, but can you see this is
2   a border of a mirror, I believe --
3         THE WITNESS:  Okay.  Okay.  Yeah.
4   That room seems to be our room.
5     Q.   (By Mr. Bouchard) Does that look to be a
6   United Inn and Suites room?
7     A.   I mean, we have, you know, this kind of
8   carpet.
9     Q.   Well, I mean, you've lived at the
10   property.  I assume you're quite familiar with what
11   --
12     A.   No, I --
13     Q.   -- the rooms look like?
14     A.   Yeah, but I'm -- but there are -- if you
15   go to any hotel in that road, they have the same
16   carpet, same beds.
17     Q.   That's what I'm asking.
18     A.   Yeah, so.
19     Q.   Does this appear to be a room at the
20   United Inn and Suites?
21     A.   Yeah.  I can say yes.
22     Q.   Showing you Plaintiff's Exhibit 21.
23         (Exhibit No. 21 was marked for
24   identification.)
25     Q.   (By Mr. Bouchard) This is a slightly

54 (Pages 210 - 213)

Page 214

1    closer up version of the photo of the plaintiff A.G.
2    are you saying you still do not recognize Ms. A.G.?
3        A.   No.
4        Q.   You said that there were 36 surveillance
5    cameras at the hotel.  Are any of those surveillance
6    cameras angled towards the parking lot at the hotel?
7        A.   Yeah, a few of them.
8        Q.   Are any of those cameras angled towards
9    the front parking lot, facing Memorial Drive?
10       A.   Yeah, few of them.
11       Q.   I think you said at the beginning of your
12   deposition, Mr. Shareef, that you handled payroll
13   matter -- matters for the company.  Is that right?
14       A.   Yeah.
15       Q.   Are you the one in charge of payroll or is
16   anybody else in charge?
17       A.   I'm the one.
18       Q.   Mr. Islam is not in charge of it?
19       A.   No.
20       Q.   Were you in charge of payroll from 2017 to
21   2019?
22       A.   Yes.
23       Q.   How do you pay the hotel staff?  Is it
24   cash, check, some other way?
25       A.   Pay cash, I pay checks.

Page 215

1        Q.   Cash and checks?
2        A.   Yeah.
3        Q.   How do you decide whether to pay cash or
4    check?
5        A.   If someone says that, you know, it's going
6    to cost them to, you know, go to the bank and cash
7    their check, and so, I pay cash just so they're not,
8    you know, paying any money to the bank.
9        Q.   If someone says they'd prefer to be paid
10   in cash, then you pay them in cash?
11       A.   Yeah.
12       Q.   Are the staff that work at the hotel paid
13   by the hour or by salary?
14       A.   Paid by the hour.
15       Q.   And that was true in 2017 to 2019?
16       A.   Yes.
17       Q.   Is there a company that handles the
18   hotel's accounting?
19       A.   I hired a CPA.
20       Q.   What's the name of the CPA?
21       A.   His name is -- 2017, 2019, Habib.
22   H-A-B-I-B, Habib.  But he died in 2021, I guess.
23       Q.   So he would have been the CPA 2017, 2018?
24       A.   Yeah.
25       Q.   2019?

Page 216

1        A.   Yeah.
2        Q.   And are the people who work at the hotel
3    or who worked there from 2017 to 2019, are they W-2
4    employees or 1099?
5        A.   Yeah, W-2 or 1099.
6        Q.   So would you have a W-2 or a 1099 for
7    everybody who worked at the hotel from 2017 to 2019?
8        A.   I should, or my CPA should have it.
9        Q.   Do you take a salary from the hotel --
10       A.   Yes.
11       Q.   -- or how are you paid?  You take a
12   salary?
13       A.   Yes.
14       Q.   What's your salary?
15       A.   About 5,000 a month.
16       Q.   Does your wife also get paid?
17       A.   Yeah.
18       Q.   Is she salaried as well?
19       A.   Yeah.
20       Q.   Same amount or --
21       A.   Uh-huh, almost same.
22       Q.   Are you a W-2 employee of the hotel?
23       A.   Yes.
24       Q.   And was that true 2017 to 2019?
25       A.   Yes.

Page 217

1        Q.   Has your pay changed since 2017, or has it
2    been about the same?
3        A.   Little bit, maybe.
4        Q.   Fairly similar, though?  I mean, was it
5    about 5,000 a month for you --
6        A.   Maybe that time --
7        Q.   What?
8        A.   4,500 before.
9        Q.   I didn't hear you.
10       A.   4,500 in 2017.
11       Q.   Do you get any bonuses based on the
12   performance of the hotel or for some other reason?
13       A.   No.
14       Q.   So you collect a flat salary?
15       A.   Yes.
16       Q.   Is that right?  And then what about your
17   percentage ownership interest, do you get some
18   additional amount based on the performance of the
19   hotel?
20       A.   Based on perform -- no.
21       Q.   Well, does Mr. Sabharwal get anything for
22   his stake in the -- in the business?
23       A.   Yes.
24       Q.   Okay.  So he does, but you do not, other
25   than your salary?

55 (Pages 214 - 217)